# In the United States Court of Federal Claims

**No. 22-816C**
**Filed: November 30, 2022**
**Redacted Version Issued for Publication: February 10, 2023[1]**

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*\*

|  |  |
|---|---|
| **KOAM ENGINEERING SYSTEMS, INC.,** | \* |
|  | \* |
|  | \* |
| **Protestor,** | \* |
|  | \* |
| **v.** | \* |
|  | \* |
| **UNITED STATES,** | \* |
|  | \* |
| **Defendant,** | \* |
|  | \* |
| **v.** | \* |
|  | \* |
| **MCKEAN DEFENSE GROUP, LLC,** | \* |
|  | \* |
| **Defendant-Intervenor.** | \* |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**Richard Rector,** DLA Piper, LLP, Washington, DC for protestor. With him were **Tom Daley** and **Leslie Edelstein**, DLA Piper, LLP, Washington, DC.

**Kara M. Westercamp**, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant. With her were **William Grimaldi,** Assistant Director, Commercial Litigation Branch; **Patricia M. McCarthy**, Director, Commercial Litigation Branch, and **Brian M. Boynton**, Principal Deputy Attorney General, Civil Division. **Tracey Ferguson,** Trial Attorney, Associate Counsel Commercial Litigation Branch, Naval Information Warfare Center Pacific, of counsel.

**Rebecca Pearson**, Venable LLP, Washington, DC; for intervenor. With her were **J. Scott Hommer, III**, **Lindsay M. Reed**, and **Allison M. Siegel**, Venable LLP, Washington, DC.

---

[1] This Opinion was issued under seal on November 30, 2022. The parties were asked to propose redactions prior to public release of the Opinion. This Opinion is issued with the some of the redactions that the parties proposed in response to the court's request. Words which are redacted are reflected with the notation: "[redacted]."

## O P I N I O N

**HORN, J.**

In the above-captioned, post-award bid protest, protestor KOAM Engineering Systems, Inc. (KOAM) challenges the decision by the United States Department of the Navy to award a contract to defendant-intervenor, McKean Defendant Group, LLC (McKean).[2] Protestor KOAM alleges that the Navy failed to "meet its obligation to strictly avoid even the appearance of a conflict of interest," and that the Navy's cost realism evaluation of McKean's proposal was arbitrary and capricious. The parties have briefed cross-motions for judgment on the Administrative Record.

## F I N D I N G S   O F   F A C T

On January 27, 2021, the Navy issued request for proposals No. N66001-21-R-0041 (the RFP) for engineering support services for the Navy's Network Integration Engineering Facility (NIEF). KOAM was the incumbent contractor for the Navy on the prior contracts. The RFP explained that "Naval Information Warfare Center – Pacific (NIWC Pacific) is responsible for basic research, end-to-end system design, prototype development, systems engineering, integration, production, software loading, Pre-Installation Testing and Checkout (PITCO), deployment, and life cycle support of Command, Control, Communications, Computer, Intelligence, Surveillance, and Reconnaissance (C4ISR) systems." The RFP contemplated an indefinite-delivery, indefinite-quantity (IDIQ) single award contract with cost-plus-fixed-fee pricing arrangement over a potential five year performance period, with one base year and four one-year option periods. The RFP provided:

(a) The contract resulting from this solicitation will be awarded to the responsible offeror whose offer conforming to the solicitation, is determined to provide the "best value" to the Government. Such offer may not necessarily be the proposal offering the lowest cost or receiving the highest technical rating.

(b) Proposals will be rated using a four-step methodology. Step One is an evaluation of Acceptability of the Offer. Step Two is an evaluation of Capability (including Technical Approach, Past Performance, and Small Business Participation). Step Three is an evaluation of the proposed cost. Step Four is a cost/technical (non-cost evaluation factors) trade-off analysis in order to determine the best value source selection decision.

---

[2] As noted in intervenor's motion for judgment on the Administrative Record: "McKean was indirectly acquired by Noblis Inc. on April 30, 2021, through Noblis Parent's acquisition of the equity in McKean Defense Group, LLC's parent company and subsequently renamed Noblis MSD, LLC." The parties refer to intervenor as McKean in their submissions in the above captioned protest. The court refers to intervenor as McKean in this Opinion, but leaves quotations unchanged.

(c) Source Selection Factors.

*Non-Cost Evaluation Factors*

**Factor I – Technical Approach**

**Factor II – Past Performance**

**Factor III – Small Business Participation**

Relative Importance of the Evaluation Factors

(d) The non-cost evaluation factors, when combined, are significantly more important than cost. However, the degree of importance of cost will increase with the degree of the equality of proposals in terms of the non-cost evaluation factors.

(e) Technical Approach is more important than Past Performance and Small Business Participation. Past Performance is more important than Small Business Participation.

(f) Evaluation of an offeror's proposal shall be based on the information presented in the proposal and information available to the contracting office from sources deemed appropriate. Sources typically considered include Defense Contract Audit Agency, Defense Contract Management Administration offices, other contracts with same firms for similar items or services, known commercial sources such as Data Resources, Inc., Standard and Poor, etc. If the proposed contract requires the delivery of data, the quality of organization and writing reflected in the proposal will be considered an indication of the quality of organization and writing which would be prevalent in the proposed deliverable data. Subjective judgment on the part of the Government evaluators is implicit in the entire process.

(capitalization and emphasis in original).

For Step One, the RFP explained, "[t]he Government will determine the acceptability of each offer on a pass or fail basis," and for Step Two, the RFP indicated "the Government will evaluate the capability of each offeror on the basis of its: (I) Technical Approach, (II) Past Performance, and (III) Small Business Participation." For "Factor I – Technical Approach," the RFP explained that

Considering the identified strengths and weaknesses, the SSEB [Source Selection Evaluation Board] will then assign an overall factor rating for technical approach. The factor rating is based on the collective effectiveness of the offeror's technical approach in meeting the Government's requirements in the SOW [Statement of Work] across all

3

submitted responses. Risk will not be evaluated as a separate factor, but will be evaluated as one aspect inherent in the evaluation of the Technical Approach. Technical Approach will receive one of the following combined technical/risk ratings: Outstanding, Good, Acceptable, Marginal, or Unacceptable.

(alterations added). For "Factor II – Past Performance," the RFP indicated:

The past performance evaluation is an assessment of the offeror's probability of meeting the solicitation requirements. The past performance evaluation considers the offeror's demonstrated recent and relevant record of performance in supplying products and services that meet the contract's requirements. In accordance with FAR 15.305(a)(2), the currency and relevance of the information, source of the information, context of the data, and general trends in contractor's performance shall be considered. These are combined to establish one performance confidence assessment rating for each offeror.

For "Factor III – Small Business Participation," the RFP provided:

The Government will evaluate the total percentage of small business participation. The inclusion of each subcontractor in the cost proposal shall serve as evidence that the prime contractor and subcontractor have entered into a business agreement; no further evidence of a business agreement is required. Only the portion of small business participation that is both listed in the matrix and substantiated by the cost proposal will be considered in the evaluation.

For Step Three, Cost, the RFP stated:

The Government will evaluate the estimated cost and proposed fee of each offer for realism and reasonableness in accordance with FAR Subpart 15.4 and as described below. The purpose of this evaluation will be (a) to verify the offeror's understanding of the requirements; (b) to assess the degree to which the cost/price proposal reflects the approaches and/or risk assessments made in the proposal as well as the risk that the offeror will provide the supplies or services for the offered prices/cost; and (c) assess the degree to which the cost reflected in the cost/price proposal accurately represents the work effort included in the proposal. Proposed costs may be adjusted, for purposes of evaluation, based upon the results of the cost realism evaluation. In a competitive environment, an offeror is incentivized to propose the lowest possible price; therefore, downward cost realist adjustments generally will not be made. When a cost realism analysis is performed, the resulting realistic cost estimate will be used in the evaluation. Cost realism analysis may be limited to those offerors whose proposals represent the most likely candidate(s) for award, based on the

4

Government's technical evaluation and the offeror(s) proposed costs. In addition to easily identifiable cost adjustments, unrealistic cost proposals may result in a re-evaluation and concurrent rescoring of technical proposals. Such re-evaluation based on cost or realistic cost analysis could negatively impact the technical rating and ranking of the proposal. Depending on the number of offerors and the number and dollar amount of proposed subcontractors, the Government may choose to limit the extent of the cost realism analysis of offerors' proposed subcontractor costs. In such instance, the Government will establish a threshold whereby individual subcontractor cost proposals that do not meet the threshold will not undergo a cost realism analysis. The threshold established by the Government may consist of a percentage of the prime contractor's proposed costs, or a dollar amount, or a combination thereof. All offers with separately priced line items will be analyzed to determine if the prices are unbalanced. Offers may be rejected if the Contracting Officer determines the lack of balance poses an unacceptable risk to the Government.

Finally, for Step Four, the "Trade-Off Process," the RFP explained:

The contract resulting from this RFP will be awarded to the responsible offeror whose offer, conforming to the RFP, is determined to provide the best value to the Government, which may not necessarily be the proposal offering the lowest cost, nor receiving the highest technical rating. In order to select the winning offeror, the Government will compare all offerors under consideration for award by trading off the differences in the non-cost factors against the difference in most probable cost and proposed fee between the offerors, as follows:

(a) If an offeror is better in terms of the non-cost factors and has the lower evaluated cost and proposed fee, then the Government will consider that offeror to be the better value.

(b) If an offeror is better in terms of the non-cost factors but has the higher evaluated cost and proposed fee, then the Government will decide whether the differences in the non-cost factors are worth the difference in cost and fee. If the Government will consider the differences in the non-cost factors to be worth the difference in evaluated cost and proposed fee, then the Government will consider the offeror with the higher evaluated cost and proposed fee to be the better value. If not, then the Government will consider the offeror with the lower evaluated cost and proposed fee to be the better value.

(c) The Government will continue to make comparisons among all offerors in this way until the Government has decided which offeror is the best value.

The RFP also indicated that

[t]he Contract Specialist will be the sole evaluator for Acceptability of the Offer, Small Business Participation, and Cost. The Contract Specialist will not evaluate any other factors. Input from the SSEB Chairperson and other SSEB members may be solicited. Except for the Contract Specialist, the SSEB will not have access to cost proposals; however, with approval of the SSA, the Contract Specialist may disclose selected cost information as required (e.g., when technical analysis is necessary to make a realism or reasonableness determination).

(alteration added).

The RFP further explained:

The Contractor shall perform work at the contractor's facilities and/or onsite at government facilities and on travel in support of designated activities. Because the NIWC Pacific Code 42150 leadership resides in San Diego, the majority of the production and PITCO/GAT support will be required to be supported within the NIWC Pacific (4301 Pacific Highway, San Diego, CA) Area of Responsibility (10 Miles). The majority of engineering support is expected to be off site at the contractor facility.

Included with the Technical Approach Worksheet in the Source Selection Plan were questions and answers:

**1.) What tools and techniques will you employ to manage Cost, Schedule, and Performance of the multiple projects and associated C4ISR [Command, Control, Communications, Computers, Intelligence, Surveillance and Reconnaissance] Task Orders that will be accomplished during the execution of this contract?**

**The written technical approach should address but is not limited to discussion of applications and or existing company policies/procedures that will enable you to track and report financials, such as funds received, funds expended, and funds remaining at the CLIN [Contract Line Item Number] level within Task Orders and for the contract as a whole. Describe your approach for tracking and reporting the status of deliverables and all milestones to achieve timely distribution of deliverables? What system(s) will you employ to track and report risks and issues that need to be addressed in order to minimize delays to scheduled deliveries?**

**2.) What tools and techniques will you use to manage the inventory, tracking, and reporting of C4ISR materials that will be moving between the different functional areas and physical locations within the NIEF?**

**The written technical approach should address but is not limited to the discussion of applications and or existing company policies/procedures that will enable you, in real time, to track and report receipt, storage and movement of all material in the possession of the NIEF. This would include the receipt and storage in the warehouse facility that is cataloged and auditable at any time to ensure accountability. This also includes means of tracking material as it is removed from the warehouse and delivered to a different physical functional area such as the Quality Assurance area or the Production floor.**

**3.) Question: What tools and techniques will you use for management and completion of C4ISR engineering projects from Requirements to Delivery, for the development of Engineering Development Model (EDM) / First Article System (FAS), and execution of Environmental Qualifications Testing (EQT)?**

**The written technical approach should address but is not limited to the discussion of applications and or existing company policies/procedures that allow you to organize, develop and document the processes required to deliver an EDM or First Article. Identify and describe the System Engineering Plan that you intend to implement to manage the above and keep track of milestones throughout the process. Identify the milestone achievements/reviews you plan to monitor in the lifecycle of the Systems Engineering Technical Review (SETR) process. Provide a detailed approach to how you will execute Environmental Qualifications Testing.**

**4.) Question: What tools and techniques will you use to properly execute Pre-Installation Check-out and Operational (PITCO) Testing and Government Acceptance Testing (GAT) as well as Factory Acceptance Testing (FAT) for C4ISR systems and components that are received or developed by the NIEF?**

**The written technical approach should address but is not limited to the discussion of applications and or existing company policies/procedures that allow you to organize, execute, track and document the successful completion of PITCO testing and GAT/FAT requirements. Describe your approach and the sequence in which you plan to perform these tests and report status and percentage of completion. What is your approach for tracking discrepancies and the ability to correct these discrepancies if required?**

(capitalization and emphasis in original; alterations added).

In response to the RFP, only KOAM and McKean submitted proposals on February 26, 2021. During the evaluation process, the Navy contacted McKean to clarify its proposal and asked:

In order to complete our cost realism analysis additional clarification is required. The subject RFP states some of the work is required to be performed in the San Diego, CA area. In order to complete our cost realism analysis using the actual rates submitted in your cost proposal, we need you to clarify for each of the named individuals, where the work was performed for the rates submitted.

McKean subsequently submitted the requested information.

As indicated in the Source Selection Authority's August 23, 2021 Business Clearance Memorandum:

Recommend approval to award a single IDIQ contract to McKean under solicitation N66001-21-R-0041 as a five (5) year contract valued at $187,467,409.92. Based on the analysis herein, McKean's proposal represents the best value to the Government. Recommend award be made based on initial offers. The solicitation included FAR provision 52.215-1, which notified potential offerors, "the Government intends to evaluate proposals and award a contract without discussions with offerors."

A summary of Best Value Ranking and Most Probable Costs are as follows:

| Best Value Rank | Offeror | Acceptability | Factor I Technical Approach | Factor II Past Performance | Factor III Small Business Participation | Proposed Cost | Probable Cost |
|---|---|---|---|---|---|---|---|
| 1 | McKean | Acceptable | Good | Satisfactory Confidence | Good | $187,467,409.92 | $195,045,486.39 |
| 2 | KES | Acceptable | Good | Satisfactory Confidence | Outstanding | $204,870,045.22 | $204,870,045.22 |

Regarding McKean's cost proposal, the Source Selection Authority noted:

McKean combined with their subcontractors proposed all hours and overtime hours in accordance with the RFP. McKean proposed prime hours on 69% of the overall level of effort in terms of hours. McKean proposed on a CPFF [Cost Plus Fixed Fee] basis. According to DCAA Audit Report No. 6151-2015T17741001 dated 6 February 2015, McKean's accounting system was found adequate. Therefore, McKean's accounting system is considered suitable for a cost reimbursement contract. Based on the analysis below, McKean's proposed costs were found to be 3.89% or $7,578,076.48 below the realistic cost; therefore, a cost realism adjustment

was made and McKean's cost was realized up from $187,467,409.92 to $195,045,486.39.

(i). Prime Direct Labor.

McKean proposed direct labor rates for 28 labor categories with a list of rates for 128 employees. McKean's direct labor rates were developed by using the actual salaries for the proposed current McKean employees or the contingent salaries (three employees) for the proposed contingent McKean employees, in which signed Letters of Intent were provided. Although McKean's rates were substantiated with corresponding employee payroll information, clarifications revealed not all of the payroll information provided was for work within San Diego. Twenty of the 128 proposed rates were based on actual labor rates for named individuals whose labor rate were substantiated by payroll records and whose place of performance of work was San Diego, CA, were deemed realistic and reasonable and are shown in averages in the first table below. The rates for 108 of the 128 rates proposed by McKean were based on work performed outside of San Diego. 24 of the 108 non-San Diego based rates were found to be equal or above the average San Diego Rates identified in the San Diego Rates Utilized for Cost Realism Analysis Table on page 24 and no cost realism adjustment was made. However, 84 of the 108 non-San Diego based rates for individuals in the remaining 21 labor categories were lower than the San Diego Rates Utilized for Cost Realism Analysis Table on page 24. The direct labor rates for these 84 employees were realized up accordingly to the San Diego Rates identified in the San Diego Rates Utilized for Cost Realism Analysis Table on page 24, as shown in the second table below. The tables below includes direct labor rates proposed per labor category for the base year, which were escalated by [redacted]% year over year for the option years. Proposed overtime hours for exempt and non-exempt employees were reviewed and found to be realistic. Overtime rates for non-exempt employees working as Junior Configuration Management Specialist, Senior Material Specialist, Material Specialist, Technical Typist, Warehouse/Forklift Operator, and Assembler Electronic/Electrical were proposed [redacted]. Overtime rates for the remaining labor categories proposed were for exempt individuals that were proposed [redacted]. Based on the rationale above, McKean's direct labor rates were realized up accordingly.

(alteration added). Regarding KOAM's cost proposal, the Source Selection Authority stated:

KES combined with their subcontractors proposed all hours and overtime hours in accordance with the RFP. KES proposed prime hours on 84.5% of the overall level of effort in terms of hours. KES proposed on a CPFF basis. The DCMA administrative contracting officer (ACO) sent a final determination letter, which formally approved KES' accounting system

9

based on a post award review of KES accounting system documented in DCAA Audit Report No. 4151-2020C17741003 on 12 August 2020. Therefore, the KES's accounting system is considered suitable for a cost reimbursement contract. Based on the analysis below KES's proposed costs were found to be realistic; therefore, no cost realism adjustment was made.

(i). Prime Direct Labor.
KES proposed direct labor rates for 30 labor categories with a list of rates for 160 employees. KES' direct labor rates were developed for most labor categories and hours using named individuals currently supporting the existing NIEF requirement. All of KES rates for named individuals were substantiated with corresponding employee payroll information for work performed in San Diego. According to KES' proposal, "labor categories that KES did not have enough named individuals to support the number of hours in a labor category, KES utilized labor category averages based on named individuals of in their proposal in those respective labor categories. KES utilized an ERI rate for one labor category." This method to use the average rate of named individuals for work performed in San Diego or ERI was determined reasonable.

The Source Selection Authority conducted a trade-off analysis explained that

McKean and KES[3] received the same rating for the most important non-cost factor, Factor I – Technical Approach, as they each received Good ratings for demonstrating a thorough approach and understanding of the requirements. KES' received twenty-eight (28) strengths, and thirteen (13) weaknesses, and McKean received three (3) significant strengths, nineteen (19) strengths and eight (8) weaknesses. Neither KES nor McKean received any significant weaknesses.

(footnote added). The Source Selection Authority concluded, regarding Factor I "[o]verall, the Government did not find any trade-off appropriate with regard to Technical Approach based upon the various significant strengths, strengths and weakness assigned to KES and McKean as described above," and "[t]aken as a whole, both offerors demonstrated a thorough technical approach, and there was no trade-off warranted." The Source Selection Authority continued:

Based on the past performance evaluation, the Government has a reasonable expectation that either offeror will successfully perform the

---

[3] The Navy's evaluation documents, and other documents in the Administrative Record refer to KOAM as "KES." Most of the filings in the above captioned protest refer to protestor as "KOAM." The court refers to protestor as KOAM unless quoting directly from the Administrative Record.

required effort. The Government did not find any trade-off appropriate with regard to Past Performance. Although McKean's past performance was less relevant, it had higher quality ratings that were supported by comments in the CPARS [Contractor Performance Assessment Reporting System]. The higher quality gave the Government reasonable confidence that McKean will be able to perform even though the references were less relevant. While KES' Past Performance was very relevant, the quality/success ratings were lower. While the Government has reasonable confidence that KES can perform, the confidence is decreased by the continuing issues with performance for the most relevant work. Overall, while different in terms of the underlying relevance and quality ratings, the Government's confidence is similar with both, and did not find any trade-off appropriate for past performance.

McKean and KES were very close in the least important non-cost factor, Factor III - Small Business Participation, as McKean was rated Good for indicating a thorough approach and understanding and KES was rated Outstanding for indicating an exceptional approach and understanding of the small business objectives. Although, McKean received a slightly lower rating than KES in Small Business Participation, McKean was only half a percent away from being assessed as Outstanding. Meanwhile KES, as a small business, received an Outstanding rating, as they easily met the 20% threshold needed to obtain an Outstanding rating in Small Business Participation by proposing to perform about 82% of the work in house as the prime contractor.

In terms of cost, McKean's proposed cost were adjusted during the cost realism analysis. KES' proposed realistic direct and indirect cost that were compared to company payrolls, and indirect rate information provided by DCAA and DCMA, and were not adjusted during the cost realism analysis. McKean's probable cost of $195,045,486.39 was 4.80% or $9,824,558.83 lower than KES' probable cost of $204,870,045.22.

With regard to Small Business Participation, KES demonstrated an outstanding use of small business with 82% small business utilization. McKean also demonstrated a very high Small Business utilization of 19.47%, which is just below the outstanding level as well. There is a benefit to KES' higher small business utilization, but Small Business is the least important non-cost factor. In terms of trade-off the Government finds that KES' better Small Business Utilization does not warrant a premium of 4.80% or $9,824,558.83.

KES did receive a higher rating in small business participation; however, McKean was a fraction of a percent from matching KES rating of Outstanding for small business participation. Consistent with M-2 of the solicitation, "If the Government will consider the differences in the non-cost

factors to be worth the difference in evaluated cost and proposed fee, then the Government will consider the offeror with the higher evaluated cost and proposed fee to be the better value. If not, then the Government will consider the offeror with the lower evaluated cost and proposed fee to be the better value." The differences between KES' and McKean's non-cost factors were not enough to overcome the difference between the evaluated costs, where McKean's evaluated cost was 4.80% or $9,824,558.83 lower than KES.

Based on the rationale above, McKean was evaluated as the best value contractor after consideration of both cost and non-cost factors.

Source Selection: I, Sharon Pritchard, the Source Selection Authority for this procurement, have independently reviewed all SSEB evaluations provided herein. As a result of such review, I have determined McKean's proposal represents the best value to the Government and, therefore, McKean to be the awardee.

Therefore, on August 21, 2021, the Navy awarded a contract to McKean.

After the Navy provided an Unsuccessful Offeror Notice to KOAM, KOAM requested a debriefing and provided the Navy with a list of 55 debriefing questions, including: "Freddie Saucedo, a member of McKean's senior management staff, is married to a NIWC PAC contracting officer's representative on KES' existing contract, and the contracting officer's representative has access to KES' proprietary cost data. What actions did the Government take to address this issue and ensure the integrity of the procurement?" On September 2, 2021, the Navy provided KOAM with a written debriefing.

After the debriefing, on September 14, 2021, KOAM filed a protest at the United States Government Accountability Office (GAO) alleging, among other issues, that "the Navy's decision to award the contract to McKean (the only other offeror) is flawed and deeply concerning because McKean has proposed labor costs so low that McKean will be unable to provide contractor personnel at the Navy's facilities in the San Diego area, as required," and alleging "the Navy's apparent failure to address an appearance of impropriety concerning a familial relationship between a McKean executive and one of the Contracting Officer's Representatives ('CORs') on the incumbent contract." In response to the protest, on September 27, 2021, the Navy informed the GAO that, "[a]fter reviewing the subject protest, the Agency will undertake corrective action" and represented to the GAO that "the Agency will conduct an investigation into a possible organizational conflict of interest, and possible personal conflict of interest. After completing both steps, the Agency will make a new source selection decision, as appropriate." On September 30, 2021, the GAO dismissed KOAM's protest.

Upon the dismissal of the GAO protest, the Navy undertook an investigation into the conflict of interest issue raised by KOAM. In defendant's cross-motion for judgment on the Administrative Record, defendant represents: "Upon being notified of the potential

personal conflict of interest, the Navy immediately began its investigation of the apparent personal conflict of interest before GAO even dismissed KOAM's first protest," which is reflected in an exchange of emails between the contract specialist, Johannes Cardenas, and Ms. Saucedo, sent on September 20, 2021 and September 21, 2021. The email below includes the questions asked by Contract Specialist Cardenas and the answers provided by Ms. Saucedo and is presented in full:


Good afternoon,

Please note, due to the confidentiality of the contents within: This e-mail message, including any attachments, is for the sole use of the intended recipients and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited.

PLEASE DO NOT FORWARD OR DISCUSS THE CONTENTS OF THIS EMAIL WITH ANYONE BESIDES THE CONTRACTS AND LEGAL TEAM, WHICH CONSIST OF NORMAN JULIEN, JOHANNES CARDENAS, AND TRACEY FERGUSON[4] WITHOUT THE EXPRESS WRITTEN PERMISSION OF SENDER. THIS EMAIL CONTAINS QUESTIONS THAT REQUIRE A RESPONSE BY COB TOMORROW, 21 SEPTEMBER 2021. IF FOR ANY REASON, YOU ARE UNABLE TO ANSWER THE QUESTIONS BE THE DEADLINE, PLEASE LET ME KNOW IMMEDIATELY AND PROVIDE A REASON WHY.

NIWC Pacific received a post award protest in response to the recent award of the NIEF Engineering contract that resulted from solicitation N66001-21-0041. The unsuccessful offeror presented the following argument:

The Navy Failed To Reasonably Consider A Conflict And Appearance of Impropriety Concerning A COR On The Incumbent Contract….a COR for the incumbent contract, Ms. Jaime Saucedo, is married to a McKean executive (Mr. Freddie Saucedo). As a COR for the incumbent contract, Ms. Saucedo may have participated personally and substantially in the subject procurement and, even if she did not, still had access to KES's cost information and cost proposals under the incumbent contract. Because Ms. Saucedo's marriage to a McKean executive creates a conflict of interest and an appearance of a potential impropriety.

---

[4] Norman Julien was the contracting officer for the procurement at issue in the above captioned bid protest and the author of the personal conflict of interest memorandum. Johannes Cardenas was the contract specialist for the procurement at issue and was the author of the email sent to Ms. Saucedo on September 20, 2021. Tracey Ferguson was an attorney with the Naval Information Warfare Center Pacific and is of counsel in the in the above captioned bid protest.

I'm reaching out to you to assist the contracting officer in the investigation of whether an OCI was present during the preparation for or during the evaluation of the NIEF Engineering requirement, solicitation N6001-21-R-0041.

The question we are seeking to address is whether McKean had an "unequal access to information OCI" via information that may have been shared between a COR on the current NIEF Engineering contract N66001-18-D-0075 held by KES, and whom the protest documents refer to as the COR's husband and also a McKean executive.

"An 'unequal access to information' OCI arises where 'a firm has access to nonpublic information as part of its performance of a government contract and where that information may provide the firm a competitive advantage in a later competition for a government contract.' In such cases, the primary concern is minimizing the risk that a firm will gain an unfair competitive advantage over other offerors. The FAR contemplates that an OCI may arise from access to proprietary information and source selection information" (Conflict and Intrigue in Government Contracts: A Guide to Identifying and Mitigating Organizational Conflicts of Interest; Public Contract Law Journal; Volume 35, No. 4; Summer 2006).

In order to validate whether an "unequal access to information OCI" may have existed, it's important that the contracting officer receives answers to several questions. Please review and provide your response to the following questions, and return to the following members of the contracts and legal team:
(norman.p.julien.civ@us.navy.mil), (johannes.t.cardenas.civ@us.navy.mil), and (tracey.l.ferguson3.civ@us.navy.mil).


1) What is your job?

I [Ms. Saucedo] am a project manager and COR [Contracting Officer Representative] for several programs at the NIEF.

2) What are your duties?

Develop task orders based on sponsor requirements, oversee task orders, and other COR duties.

3) What role do you have in relation to the NIEF Engineering contract?

N6001-18-D-0075, my role is project manager and COR of multiple projects.

4) How long, how much of your job/work is as a COR and how much as a COR for NIEF?

I have been at NWIC PAC since 2012 and have worked at the NIEF since 5 April 2018. I have been a COR my entire time at the NIEF.

5) Who is your Supervisor, Branch head, and Division Head?

[redacted] was my branch head up through July 2021 – [redacted] and [redacted] are currently acting branch heads.

6) Which contracting officers do you work with?

Marianito "Nito" Rosal is the KO and Bennett McDonald is the CS.

7) What KES[5] non-public information did you have access to in the past year? (Examples would include access to proposals containing labor rates, indirect rates, etc.)

As a COR on this contract I have had access to task order proposals which include all financial data (labor rates, indirect rate, ect) [sic]

8) Did you have ANY input into drafting the requirements, IGCE, CDRLS, solicitation, etc. for the NIEF engineering requirement that became RFP N6001-21-R-0041?

I did not have any input in drafting the requirements for RFP N6001-21-R-0041, nor have I had any access to the solicitation package.

9) Did you have any other role/discussion/access to anything related to the requirements, development of the RFP/solicitation, evaluation, IGCE, etc.

No, I did not have any role in anything related to RFP N6001-21-R-0041.

10) Did you participate at all in the evaluation process?

No, I was not involved in the evaluation process of RFP N6001-21-R-0041.

11) Are you married or in a close personal relationship? To whom? For how long?

I am married to Alfredo Saucedo and have been for 8 years.

12) How long have you known Mr. Freddie Saucedo? Do you live together?

---

[5] Ms. Saucedo and Contract Specialist Cardenas both refer to KOAM as KES in the email exchange.

I have known Alfredo Saucedo for 13 years, we have lived together for 10 years.

13) Was Mr. Saucedo ever a government employee?

Mr. Saucedo served in the Navy, but has never been a federal employee.

14) Do you work with Mr. Saucedo? On what types of things?

No, I do not currently work with Mr. Saucedo on any projects.

15) Did you ever discuss your work as a COR on the KES contract with Mr. Saucedo? How often? What types of things concerning the contract were discussed?

The only thing I have discussed with Mr. Saucedo regarding my work at the NIEF is high level project details, never have discussed my role as COR or the details of that work.

16) What non-public information, if any, did you share with Mr. Saucedo and when? For example, did you ever discuss labor rates such as pay between KES and McKean?

I have never discussed any labor rates or any other financial contract information with Mr. Saucedo.

17) Have you worked from home? If so, for how long, how often, etc.?

I have been working full time from home due to the COVID 19 Pandemic.

18) Are you in the same household? If the answer to question is yes, To your knowledge, did he ever have access to any information provided by KES to the Government? Is it possible that he may have had access to information provided by KES without your knowledge via access to documents, emails, or your government computer?

Yes, we are married and live in the same household. My government computer requires a CAC [Common Access Card] to log in and Mr. Saucedo does not have access to my computer. We have to separate offices in our home and I always close the door when I have any discussions on the phone regarding anything related to my COR duties.

19) Did you ever discuss Mr. Saucedo's job with your co-workers? Who, when and how often?

I haven't discussed his job with co-workers, however, co-workers know he works for Cabrillo. In his current role, he does work with the NIEF on projects, not any projects I am responsible for.

20) Do you know any of Mr. Saucedo's co-workers? If so who, how well, how much contact?

I know several of Mr. Saucedo's co-workers, many of them I have worked with before on previous projects. I do have a close personal relationship with [redacted], however, have not had any real contact with her over the past year and a half, just some texting, but nothing about work.

21) Did you ever discuss your work with Mr. Saucedo's co-workers as a COR, or anything about KES?

I do not discuss anything that is contract sensitive with anyone, I understand it is unethical for me to divulged any financial data – IGCE's, Labor Rates, Cost Proposals – none of this is ever discussed expect with other CORs of the contract. I also do not discuss KES with anyone, but other CORs on the contract.

22) Were you aware that Mr. Saucedo's company was competing for the NEIF Engineering contract? If so, when did you find out? How or from whom did you find out?

I did know the company was developing a proposal for this contract, Mr. Saucedo told me. I am not sure when the contract actually went out for bidding but I knew before the proposal was submitted. Other than knowing they were developing a proposal, we did not have any other discussion about the contract.

23) If known, when did Mr. Saucedo find out that his company had proposed on the NIEF Engineering contract? Did Mr. Saucedo know he was named in the proposal for the NIEF Engineering contract?

I am not exactly sure when Mr. Saucedo new [sic] his company was bidding on the NIEF engineering contract. It is my understanding he knew he was named in the proposal.

24) Did you ever share concerns about your role as a COR in conjunction with Mr. Saucedo's job at McKean with anyone at work? With the KO? Your supervisor? A Coworker?

My supervisor and IPT [Integrated Product Team] lead both know that Mr. Saucedo works for Cabrillo. When McKean won the contract, we did discuss

17

that my role as COR would have to end and I would need to have another role within the NIEF.

25) If there were concerns, did you tell anyone within NIWC PAC about a potential OCI [Organizational Conflict of Interest]?

I really didn't have huge concerns as I was completely excluded from the entire contract development and selection process. I did not read the PWS or have any input into the package at all. I am not even aware of how many companies submitted proposals.

(capitalization and first alteration in original; footnote added).

On October 21, 2021, counsel for KOAM, and protestor's counsel of record in the above captioned protest, sent the Navy a letter, which stated in part:

Following the dismissal of the [GAO] protest as academic, KES learned that Ms. Saucedo has communicated with her husband in the past about ongoing Navy programs in which McKean was involved. Specifically, KES has been advised that, in multiple meetings in the past, NIEF government project leads have discussed problems and concerns regarding the Military Sealift Command ("MSC") program office, on which McKean and Mr. Saucedo provide contract support to PMW 160. When the NIEF MSC government project lead expressed frustration with the MSC program and its effects on the NIEF during weekly meetings of government project leads, Ms. Saucedo has spoken up to defend the MSC program based on information she has learned from her husband. In other words, Ms. Saucedo clearly has information about McKean and her husband's work on the MSC program that is unrelated to her role at the NIEF, and she has shared that information with NIEF officials in the past in a way that has been helpful to McKean. Although this may not, in and of itself, constitute improper behavior, it does demonstrate that Mr. and Ms. Saucedo discuss details of their work for the Navy and share certain program-related information. Thus, it supports the concern about an appearance of impropriety, so we felt compelled to relay the information to you.

Both Ms. Saucedo and Mr. Saucedo subsequently provided sworn declarations. Mr. Saucedo's declaration, executed on February 12, 2022, stated in full:

I, Alfredo "Freddy" Saucedo, Senior Systems Engineer for Noblis MSD, LLC declare:

1. I am over the age of twenty-one and have personal knowledge of all representations contained herein.

2. I am a Senior Systems Engineer for Noblis MSD, LLC, formerly McKean Defense Group, LLC ("McKean") (collectively "Noblis") on mechanical engineering and system development and networks. I have served in this role since 2014. I am responsible for providing direct technical support to the Other Costumer Funds ("OCF") Assistant Program Manager ("APM"), and the Technical Design Agents ("TDA") on all matters related to production engineering, systems engineering, design, and shipboard installation. My tasking requires me to collaborate with Program off ice government leads, Network Integration and Engineering Facility ("NIEF") Government project lead(s), NIEF production integrators, Shipboard installers, project leads and engineers (U.S. Government and contractors). My current support role is limited to projects under the OCFs umbrella.

3. I, Inc. ( "KES" or "Protester"), at the U.S. Government Accountability Office, docketed as File No. B-42157, challenging the evaluation and award of a contract by the United States Department of the Navy, Naval Information Warfare Systems Center Pacific (the "Navy" or "Agency") to Noblis under Solicitation No. N6600121R0041 ("RFP" or "Solicitation"). I have reviewed the redacted version of the Protest filed by KES.

4. As KES described in its protest, the Solicitation at issue provides:

> the Navy with program management, basic research, end-to-end system design, prototype development, systems engineering, integration, environmental qualification testing ("EQT") , production, software loading, pre-installation testing and checkout ( "PITCO"), deployment, and life cycle support of Command, Control, Communications, Computer, Intelligence, Surveillance, and Reconnaissance (C4ISR) systems for the NIWC Pacific Network Integration Engineering Facility ("NIEF") .

Redacted Protest at 4.

5. In its protest, KES alleged that I was an "executive" of McKean Defense Group, LLC and that my relationship with my wife, who is a Contracting Officer's Representative ("COR") on KES's incumbent contract, creates an "appearance of potential impropriety." Redacted Protest at 28.

6. I have never served as an executive of McKean Defense Group, LLC or Noblis. Instead, I am a Senior Systems Engineer. In its proposal in response to the Solicitation, Noblis proposed me in a key personnel role as Senior Systems Engineer.

7. My wife, Jaime Saucedo, serves as the COR administering the incumbent contract for this effort, which is currently being performed by KES at the

Naval Information Warfare Systems Center Pacific, NIEF. My wife also serves as a Project Lead at NIEF. She and I do not work on the same projects.

8. My wife and I do not discuss her management of contracts. Accordingly, I am not aware of my wife's specific duties as a COR regarding administration of KES's **incumbent contract**. I **do** know that she has **never** shared with me any proprietary or sensitive information of a contractor that she oversees, including KES.

## Access to or Knowledge of KES's Proposal

9. KES's protest alleges that "[a]s a COR for the incumbent contract, [redacted], [she] may have participated personally and substantially in the subject procurement . . ." That allegation is incorrect. Redacted Protest at 28. My wife and I do not discuss her role, if any, in the evaluation of proposals or award decision resulting in a contract being awarded to Noblis under the **current Solicitation.**

10. I have never had access to, viewed, nor possessed any portion of or information regarding KES's proposal for the NIEF contract at any time, either under the incumbent effort or the proposal KES submitted under current Solicitation for this effort.

11. My wife and I have not discussed KES's proposal under the current Solicitation. To the best of my knowledge, my wife is not involved in the protested procurement and I am not aware that she has access to KES's proposal or the evaluation thereof. Nor have I ever received or been told any information regarding KES's price or costs under KES's incumbent contract by my wife.

## Access to Jaime Saucedo's Work Files

12. I have never accessed my wife's Navy computer or work files at any time.

13. While we both work from home, especially since the pandemic, we both maintain separate offices. My wife has her own office where she keeps her work computer. She accesses her files electronically from her work computer through the Navy/Marine Corps Intranet ("NMCI") system which requires multi-factor authentication to confirm her identity. To my knowledge, her Navy computer remains locked when she is not using it.

14. I cannot and have not ever accessed any of her work files, including any files related in any way to KES's incumbent contract or proposal submitted in response to the Solicitation.

15. I do not possess any of her passwords or credentials for her Navy computer, databases, files, etc.

**Involvement in Noblis' Proposal Submission**

16. In the Summer of 2021, I provided input on discrete technical matters during the drafting of McKean Defense's (now Noblis) technical proposal submitted in response to the Solicitation. Specifically, I provided early input regarding rack configuration and installation technical drawings, system development, and installation processes given my expertise as a production engineer. While the inputs I provided on such technical matters were used to draft portions of Noblis' technical proposal, I did not myself draft the final technical section of the proposal, nor did I review the technical proposal before submission.

17. I was never contacted or asked to provide any input whatsoever on Noblis' cost/price proposal submitted in response to the Solicitation, nor did I ever provide any input on the cost/price proposal whatsoever. I neither viewed nor had access to Noblis' cost/price proposal or any cost details used as inputs for that cost/price proposal prior to submission. In fact, to this day I have never seen the details of this cost/price proposal.

18. I was not involved in any way in Noblis' decision to compete under the Solicitation.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

(capitalization, emphasis and alterations in original; footnote omitted).

Ms. Saucedo's declaration, executed on February 23, 2022, stated in full:

I, JAIME SAUCEDO, declare:

1. I am currently the Project Manager and Contracting Officer Representative (COR) for several programs at the Network Integration Engineering Facility (NIEF) at the Naval Information Warfare Center Pacific (NIWC PAC). I began this position in April of 2018. Prior to this position, I worked as a COR for one year for another project. I have worked for the federal government since December 2012.

2. In my position as the NIEF Engineering COR for Contract N66001-18-D-0075, I am responsible for developing task orders based on sponsor requirements, overseeing task orders, and other COR assigned duties. I am and have been a COR on other contracts at the NIEF, Production MAC

N66001-16-D-032033, SAIC (Science Applications International Corporation) and SERCO INC are the primes.

3. Until July 2021, my first-line supervisor was Branch Head [redacted]. Currently, I am supervised by [redacted].

4. During my tenure as the COR on N66001-18-D-0075, I only worked on one PMW-160 project which was short term. I do not recall attending a government or government/contractor meeting wherein I discussed Military Sealift Command NIEF related efforts.

5. As a COR on contract N66001-18-D-0075, I have access to task order proposals, which include financial data, such as, labor rates, indirect rates, etc….

6. I did not have any involvement in drafting the requirements for Request for Proposal (RFP) N66001-21-R-0041, nor did I have access to the solicitation package. I did not have any role/involvement or have any discussion/access to information related to the requirements, development of the RFP/solicitation, Independent Government Cost Estimate (IGCE), acquisition strategy, development of source selection criteria, evaluation of proposals or the award decision.

7. I have been married to Alfredo Saucedo for 8 years. Alfredo Saucedo is employed by Noblis as an engineer. Mr. Saucedo served in the Navy, but has never been a federal employee. I do not currently work with Mr. Saucedo on any projects.

8. I have never discussed my role as COR or the details of that work with my husband. I have never disclosed any third party proprietary information, like KES or its subcontractors' labor rates, or any other financial or contract information with Mr. Saucedo. The only thing I have discussed with Mr. Saucedo regarding my work at the NIEF is very high-level project details.

9. I have been working full time from home due to the COVID 19 Pandemic. Mr. Saucedo and I are married and share the same household. We have two separate offices in our home and I always close the door when I have any discussions on the phone regarding anything related to my COR duties. My government computer requires a CAC to log in and Mr. Saucedo does not have access to my computer. I do not have a government cell phone. I do not scan or print any documentation in my home office. I do not have a hard copy material in home office other than hand written notes for my own tasking that did not include third party proprietary or source selection sensitive information. When I am not in front of my computer, the CAC is in a secure location.

10. I know several of Mr. Saucedo's co-workers, many of them I have worked with before on previous projects. I have a close personal relationship with [redacted]; however, I have not had real contact with her over the past year and a half, just some texting, but nothing work related.

11. I only disclose nonpublic information to include proprietary or source selection sensitive information to government employees with a need to know. I fully understand my ethical and legal obligations regarding use, disclosure and safeguarding nonpublic information I have access to at work to include the requirements to not disclosure any financial data, such as IGCEs, Labor Rates, Cost Proposals, etc. I maintain an annual OGE 450 on file wherein I disclose my husband's employment.

12. I was aware that Mr. Saucedo's company was developing a proposal for the NIEF Engineering contract because Mr. Saucedo told me. I am not sure when the contract actually went out for bidding but I knew before the proposal was submitted. Other than knowing they were developing a proposal, we did not have any other discussion about the RFP or contract. I did not know that Mr. Saucedo was listed as key personnel on the contract.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

(capitalization and alteration in original).

After completing the investigation, on February 24, 2022, the contracting officer issued a "Personal Conflict of Interest Memorandum," which include the correspondence and declarations quoted above. The contracting officer determined that "[t]here is no evidence that Ms. Saucedo participated personally and substantially in the Procurement." (alteration added). The contracting officer noted:

The PCI [Personal Conflict of Interest] investigation confirmed from multiple sources including the written interviews of [redacted] (NIEF Branch Head and SSEB Chair), [redacted] (NIEF IPT Lead/Program Manager and initial SSEB Chair), the other SSEB members, and Ms. Saucedo (one of several CORs on KES' NIEF contract, N66001-18-D-0075) that Ms. Saucedo did not participate personally or substantially, or really in any capacity, with the follow-on NIEF Engineering source selection, including with the development of the statement of work, drafting of the source selection strategy, drafting the RFP, participating in the evaluation of proposals or selecting the awardee resulting in the NIEF Contract awarded to McKean.

(capitalization in original; internal reference omitted; alteration added). The contracting officer also noted that "[a]ll members of the SSEB (Mr. [redacted], Mr. [redacted], Mr. [redacted], and Ms. [redacted], and Mr. [redacted]) confirmed that Ms. Saucedo had no role in the evaluation of the proposals," and the contracting officer added, "[a]s

Contracting Officer for this procurement, to my knowledge and from my review of the contract file, Ms. Saucedo had no role in any part of this procurement." (alterations added). Therefore, the contracting officer wrote:

> The PCI investigation revealed the absence of any PCI concern prior to award, since Ms. Saucedo was completely excluded from the acquisition planning and throughout the source selection process for the follow-on NIEF contract. The concern of impropriety was not a pre-award concern, since Ms. Saucedo did not have any role in the source selection process for the follow-on NIEF and the evaluation of proposals. Furthermore, the SSEB members were not given access to the cost proposals, and therefore, would not have known that Mr. Saucedo was listed as a proposed employee for McKean. The SSEB did not have any available information in the non-cost proposal documents provided for their review to know that Mr. Saucedo was either proposed or if he had any involvement with McKean's proposal. When McKean received the follow-on NIEF contract award Ms. Saucedo had a discussion with her supervisor that her role would need to change in order to avoid any PCI that could arise in administration of the follow-on contract, which her husband would be employed under.

The contracting officer further determined that "although Ms. Saucedo had access to KES' Cost Proposals under KES' Prior Contracts, the evidence supports that she did not provide that information to her husband," and elaborated:

> The PCI investigation revealed that Ms. Saucedo is one of several CORs (8-10 at any given time) under KES' existing contract, N66001-18-D-0075, and also a project manager for several programs under the NIEF. According to Ms. Saucedo, her duties include the development of task orders based on sponsor requirements, overseeing task orders, and other standard COR duties. As one of the CORs, Ms. Saucedo had access to some of KES' non-public labor and indirect rate information under KES' existing NIEF contract in order to review KES' task order proposals. The contract file documents her review of one such task order proposal in October 2020.
>
> Although Ms. Saucedo had access to some of KES' cost information under the incumbent contract, Ms. Saucedo specifically denied, under penalty of perjury, providing any of KES' cost information to her husband. She also described how she protected the proprietary information she had in connection with her COR duties. While Ms. Saucedo stated she lives in the same household with Mr. Saucedo, she stated she followed proper protocols as a COR to safeguard non-public/sensitive information as required on all contracts. Ms. Saucedo's government computer requires a CAC and pin to log in, and Ms. Saucedo stated that Mr. Saucedo does not have access to her computer. Ms. Saucedo and Mr. Saucedo have separate offices in their home. Ms. Saucedo stated, "I always close the door when I have any discussions on the phone regarding anything related to my COR

duties." Ms. Saucedo stated that she has "never discussed any labor rates or any other financial contract information with Mr. Saucedo." Ms. Saucedo also said, "I do not discuss anything that is contract sensitive with anyone, I understand it is unethical for me to divulge any financial data – IGCE's, Labor Rates, Cost Proposals – none of this is ever discussed except with other CORs of the contract. I also do not discuss KES with anyone, but other CORs on the contract."

The PCI investigation revealed that although Ms. Saucedo has not discussed Mr. Saucedo's job with her co-workers, Ms. Saucedo along with some fellow co-workers knew he worked for Cabrillo, which is a unit within McKean and now owned by Noblis-MSD. Mr. Saucedo does not work on any projects or programs that Ms. Saucedo is involved in with the NIEF.

The PCI investigation revealed Ms. Saucedo was aware of Mr. Saucedo's company competing on the requirement. Ms. Saucedo stated, "I did know the company was developing a proposal for this contract, Mr. Saucedo told me. I am not sure when the contract actually went out for bidding but I knew before the proposal was submitted. Other than knowing they were developing a proposal, we did not have any other discussion about the contract." Ms. Saucedo also mentioned, "I am not exactly sure when Mr. Saucedo knew his company was bidding on the NIEF engineering contract. It is my understanding he knew he was named in the proposal." The above does not present a competitive source selection advantage to McKean, but it does present a potential postaward contract administration conflict in which Ms. Saucedo will not be appointed as the COR for the new NIEF Engineering contract award to avoid such a conflict during contract administration.

The PCI investigation revealed no reluctance on Ms. Saucedo's behalf when she was requested to provide a written response to a list of 25 questions. She provided complete, and timely cooperation (i.e., within less than 24 hours).

Similarly, Mr. Saucedo specifically declared, under penalty of perjury, that Ms. Saucedo has never shared any proprietary or sensitive information of a contractor that she oversees, including KES. Mr. Saucedo also explained he did not have access to any portion of or information regarding the proposal KES submitted, and that he cannot and has not ever accessed any of her work files. Additionally, Mr. Saucedo stated he is not a McKean executive, was not involved in any way with preparation of McKean's cost proposal submitted for the RFP, and he only had a limited role in preparing the technical proposal response.

The PCI investigation revealed that [redacted] and [redacted] are the only members of the SSEB who know Mr. Saucedo, but do not have a personal

relationship with him, and their interactions with Mr. Saucedo did not otherwise raise any issues for concern.

I did not uncover any further information related to KES counsel's 18 October 2021 email stating the KES learned that Ms. Saucedo spoke up to defend the MSC program, and thereby McKean. The information provided was vague, and offered no information as to any dates or timeframes it was alleged to have occurred. Ms. Saucedo stated in her declaration that she did not recall attending a government or government/contractor meeting wherein she discussed Military Sealift Command NIEF related efforts. Given the declarations by both Ms. Saucedo and Mr. Saucedo regarding Ms. Saucedo not revealing any proprietary information regarding KES to Mr. Saucedo, other information detailed above, and KES' admission that its allegation would not constitute improper behavior, I do not find this allegation affects my findings. Furthermore, the allegation is more about Mr. Saucedo discussing his work with Ms. Saucedo (not the reverse) which is not improper. Finally, the discussion of problems or concerns with regards to the MSC program office would not provide new or competitively useful information that would have given McKean an advantage over KES, who has overseen the full scope of work for the NIEF Engineering contract under its incumbent contracts.

(capitalization in original; internal reference omitted). The contracting officer also determined that "the evidence does not support a violation of FAR 3.104-3(a) or (b)," and explained:

Although KES did not specifically mention the Procurement Integrity Act (PIA) in its protest, or otherwise, to the extent that KES' allegation that Ms. Saucedo had access to KES' cost information and cost proposals may be construed as a possible violation of the PIA, my investigation showed no evidence that Ms. Saucedo provided cost proposals or cost information to her husband or anyone at McKean. Ms. Saucedo specifically denied, under penalty of perjury, providing any of KES' cost information to her husband. She also described how she protected the proprietary information she had in connection with her COR duties. In accordance with the COR appointment letter, Ms. Saucedo complied with her COR duties, including paragraph 5.(e) in which it states "You shall NOT…Discuss acquisition plans, strategies or provide any advance information that might give one contractor an advantage over another contractor in forthcoming procurements." Ms. Saucedo took steps to safeguard any cost information she had access to by keeping it stored on her secure CAC enabled machine.

Similarly, Mr. Saucedo specifically declared, under penalty of perjury, that Ms. Saucedo has never shared any proprietary or sensitive information of a contractor that she oversees, including KES. Mr. Saucedo also explained

he did not have access to any portion of or information regarding the proposal KES submitted, and that he cannot and has not ever accessed any of her work files. Additionally, Mr. Saucedo declared he was not involved in any way with preparation of McKean's cost proposal submitted for the RFP, and he only had a limited role in preparing the technical proposal response.

Additionally, the circumstances of this procurement would limit the competitive usefulness of any cost proposal information under KES' incumbent contract. While cost proposal information might be competitively useful in some situations, the structure of the RFP evaluation factors and type of contract (i.e., Cost type contract) limited the competitive usefulness of the cost information Ms. Saucedo had access to. The reason the information is not competitively useful is in a cost type contract, cost realism analysis is utilized to realize up any unrealistic direct labor rates (e.g. rates not based on local payrolls, which fall below the average rates for the specific locality), as well as, any indirect labor rates that fell below the contractor's approved rates from DCAA or DCMA in the form of Provisional Billing Rates (PBR), Forward Pricing Rate Agreement (FPRA), or Forward Pricing Rate Recommendation (FPRR). The labor categories and level of effort or hours to be proposed were provided in the RFP to all offerors. McKean proposed in accordance with the level of effort identified within the RFP.

(capitalization and alteration in original). Therefore, the contracting officer reasoned, "[c]onsequently, the application of cost realism analysis would have limited the competitive usefulness of any cost information Ms. Saucedo had access to." (alteration added).

The contracting officer concluded:

Based upon the above analysis, I find no conflict of interest affecting the award to McKean. I found no evidence that: (1) Ms. Saucedo participated personally and substantially in the NIEF Engineering source selection, including development of the statement of work, drafting of the source selection strategy, request for proposals, or participated in the evaluation of proposals resulting in the NIEF Contract awarded to McKean; and (2) Ms. Saucedo disclosed any competitively useful nonpublic information. I also found no evidence that Ms. Saucedo provided contractor bid or proposal information or source selection information to McKean before the award or that McKean obtained contractor bid or proposal information or source selection information before the award. Therefore, I find "no impact" on the award of the contract to McKean in accordance with FAR 3.104-7(a). Additionally, as discussed above, even if there were disclosure of cost information as alleged by KES, I do not believe that such cost information would have provided a competitive advantage due to the nature of the cost

evaluation. Although some may believe there is an appearance of impropriety based upon Ms. Saucedo's position as COR and her relationship with a McKean employee, the above information, findings and conclusions, do not support any actual impropriety. I do not believe the appearance of impropriety by itself sufficient to impact the award of the contract to McKean given all of the above.

The contracting officer's Personal Conflict of Interest Memorandum was included as an attachment to the Source Selection Authority's February 24, 2022 Business Clearance Memorandum, which again recommended McKean for award. In the February 24, 2022 Business Clearance Memorandum, the Source Selection Authority first noted that "[n]o PCI Found During Investigation," and elaborated

the Contracting Officer found no evidence that: (1) Ms. Saucedo participated personally and substantially in any capacity in the NIEF Engineering source selection, including development of the statement of work, drafting of the source selection strategy and request for proposal, or participated in the evaluation of proposals resulting in the NIEF Contract awarded to McKean; and (2) Ms. Saucedo disclosed any competitively useful nonpublic information, and what information she did possess would not have provided a competitive advantage due to the nature of the evaluation factors including cost.

(alteration added; internal reference omitted).

As reflected, the Navy's evaluations of protestor and intervenor in the February 24, 2022 Business Clearance Memorandum were identical to the evaluations in the Source Selection Authority's August 23, 2021 Business Clearance Memorandum as reflected in the table below:

| Offeror | Acceptability | Factor I Technical Approach | Factor II Past Performance | Factor III Small Business Participation | Proposed Cost | Probable Cost |
|---------|---------------|-----------------------------|----------------------------|------------------------------------------|---------------|---------------|
| McKean | Acceptable | Good | Satisfactory Confidence | Good | $187,467,409.92 | $195,045,486.39 |
| KES | Acceptable | Good | Satisfactory Confidence | Outstanding | $204,870,045.22 | $204,870,045.22 |

Regarding McKean's cost proposal, in the February 24, 2022 Business Clearance Memorandum, the Source Selection Authority stated:

McKean combined with their subcontractors proposed all hours and overtime hours in accordance with the RFP. McKean proposed prime hours on 69% of the overall level of effort in terms of hours. McKean proposed on a CPFF [Cost Price Fixed Fee] basis. According to DCAA Audit Report No. 6151-2015T17741001 dated 6 February 2015, McKean's accounting

system was found adequate. Therefore, McKean's accounting system is considered suitable for a cost reimbursement contract. Based on the analysis below, McKean's proposed costs were found to be 3.89% or $7,578,076.48 below the realistic cost; therefore, a cost realism adjustment was made and McKean's cost was realized up from $187,467,409.92 to $195,045,486.39.

(i). Prime Direct Labor.

McKean proposed direct labor rates for 28 labor categories with a list of rates for 128 employees. McKean's direct labor rates were developed by using the actual salaries for the proposed current McKean employees or the contingent salaries (three employees) for the proposed contingent McKean employees, in which signed Letters of Intent were provided. Although McKean's rates were substantiated with corresponding employee payroll information, clarifications revealed not all of the payroll information provided was for work within San Diego. Twenty of the 128 proposed rates were based on actual labor rates for named individuals whose labor rate were substantiated by payroll records and whose place of performance of work was San Diego, CA, were deemed realistic and reasonable and are shown in averages in the first table below. The rates for 108 of the 128 rates proposed by McKean were based on work performed outside of San Diego. 24 of the 108 non-San Diego based rates were found to be equal or above the average San Diego Rates identified in the San Diego Rates Utilized for Cost Realism Analysis Table on page 24 and no cost realism adjustment was made. However, 84 of the 108 non-San Diego based rates for individuals in the remaining 21 labor categories were lower than the San Diego Rates Utilized for Cost Realism Analysis Table on page 24. The direct labor rates for these 84 employees were realized up accordingly to the San Diego Rates identified in the San Diego Rates Utilized for Cost Realism Analysis Table on page 24, as shown in the second table below. The tables below includes direct labor rates proposed per labor category for the base year, which were escalated by [redacted]% year over year for the option years. Proposed overtime hours for exempt and non-exempt employees were reviewed and found to be realistic. Overtime rates for non-exempt employees working as Junior Configuration Management Specialist, Senior Material Specialist, Material Specialist, Technical Typist, Warehouse/Forklift Operator, and Assembler Electronic/Electrical were proposed [redacted]. Overtime rates for the remaining labor categories proposed were for exempt individuals that were proposed [redacted]. Based on the rationale above, McKean's direct labor rates were realized up accordingly.

(alteration added). Regarding KOAM's cost proposal, in the February 24, 2022 Business Clearance Memorandum, the Source Selection Authority indicated:

KES combined with their subcontractors proposed all hours and overtime hours in accordance with the RFP. KES proposed prime hours on 84.5% of the overall level of effort in terms of hours. KES proposed on a CPFF basis. The DCMA administrative contracting officer (ACO) sent a final determination letter, which formally approved KES' accounting system based on a post award review of KES accounting system documented in DCAA Audit Report No. 4151-2020C17741003 on 12 August 2020. Therefore, the KES's accounting system is considered suitable for a cost reimbursement contract. Based on the analysis below KES's proposed costs were found to be realistic; therefore, no cost realism adjustment was made.

(i). Prime Direct Labor.
KES proposed direct labor rates for 30 labor categories with a list of rates for 160 employees. KES' direct labor rates were developed for most labor categories and hours using named individuals currently supporting the existing NIEF requirement. All of KES rates for named individuals were substantiated with corresponding employee payroll information for work performed in San Diego.

The Source Selection Authority conducted a new trade-off analysis, and similar to the earlier Source Selection Authority's August 23, 2021 Business Clearance Memorandum, the February 24, 2022 Business Clearance Memorandum explained that

McKean and KES received the same rating for the most important non-cost factor, Factor I – Technical Approach, as they each received Good ratings for demonstrating a thorough approach and understanding of the requirements. KES' received twenty-eight (28) strengths, and thirteen (13) weaknesses, and McKean received three (3) significant strengths, nineteen (19) strengths and eight (8) weaknesses. Neither KES nor McKean received any significant weaknesses.

The Source Selection Authority concluded "[o]verall, the Government did not find any trade-off appropriate with regard to Technical Approach based upon the various significant strengths, strengths and weakness assigned to KES and McKean as described above," and "[t]aken as a whole, both offerors demonstrated a thorough technical approach, and there was no trade-off warranted." (alterations added).

For Factor II – Past Performance, and Factor III – Small Business Participation, the Source Selection Authority determined:

Based on the past performance evaluation, the Government has a reasonable expectation that either offeror will successfully perform the required effort. The Government did not find any trade-off appropriate with regard to Past Performance. Overall, while different in terms of the underlying relevance and quality ratings, the Government's confidence is

similar with both, and did not find any trade-off appropriate for past performance.

McKean was rated Good and KES was rated Outstanding for Factor III - Small Business Participation. KES, as a small business, received an Outstanding rating, since they exceeded the 20% threshold needed to obtain an Outstanding rating by proposing to perform approximately 82% of the work in house as the prime contractor. McKean also demonstrated a very high SBC utilization rate of 19.47%, which is just below the 20% level needed for an Outstanding rating and accomplishes the goal of encouraging small business participation to a good, and almost outstanding level. So while there is a distinction between the two offerors in terms of Small Business Participation, it is not a great one in terms of value to the Government.

The Source Selection Authority, in the February 24, 2022 Business Clearance Memorandum explained, although in greater detail than it had in the original Source Selection Authority's August 23, 2021 Business Clearance Memorandum,

> [i]n terms of cost, the risk of unrealistic cost was addressed by performing cost realism analysis of all cost information included within the proposals for all prime contractors and the respective subcontractors. The risk of accepting cost based on unbalanced pricing or underestimating the number of hours required to perform was mitigated by verifying that each of the prime contractors and all subcontractors proposed hours that added up to the total level of effort identified within the RFP per labor category and overall. The risk of accepting unrealistically low cost based on acceptance of rates generated from payroll information outside of the San Diego locality was mitigated via a two-part process, which consisted of: 1) identification of all non-San Diego based rates through review of each contractor's proposals or via clarification, and 2) application of an upward adjustment of non-San Diego rates to the average San Diego rate proposed by all offerors for each labor category. Using the risk mitigation tools referenced above, McKean's proposed cost were adjusted during the cost realism analysis. KES' proposed realistic direct and indirect cost that were compared to company payrolls, and indirect rate information provided by DCAA and DCMA, and were not adjusted during the cost realism analysis. McKean's probable cost of $195,045,486.39 was 4.80% or $9,824,558.83 lower than KES' probable cost of $204,870,045.22. Furthermore, the adjustment does not indicate a lack of understanding of the requirements or a concern regarding performance as based upon their performance in the non-costs factors they understand the work and have done similar work before and well.

(alteration added). The Source Selection Authority further explained that

KES and McKean received the same ratings in all non-cost factors except for the Small Business Participation factor, and no tradeoff was found appropriate in either Technical Approach or Past Performance. KES did receive a higher rating in small business participation; however, McKean was a fraction of a percent from matching KES rating of Outstanding for small business participation, and Small Business Participation is the least important non cost factor. Consistent with M-2 of the solicitation, "If the Government will consider the differences in the non-cost factors to be worth the difference in evaluated cost and proposed fee, then the Government will consider the offeror with the higher evaluated cost and proposed fee to be the better value. If not, then the Government will consider the offeror with the lower evaluated cost and proposed fee to be the better value." The differences between KES' and McKean's non-cost factors were not enough to overcome the difference between the evaluated costs, where McKean's evaluated cost was 4.80% or $9,824,558.83 lower than KES. Based on the comparison above, McKean was evaluated as the best value contractor after consideration of both cost and non-cost factors.

Therefore, the Source Selection Authority concluded:

I, Sharon Pritchard, the Source Selection Authority for this procurement, have independently reviewed all SSEB evaluations provided herein. As a result of such review, I have determined McKean's proposal represents the best value to the Government and, therefore, McKean to be the awardee.

Recommendation: The Government's findings from the review process conducted after GAO's dismissal of KES' protest, reaffirmed that McKean's proposal represents the best value to the Government. Therefore, approval is requested to award an Indefinite Delivery, Indefinite Quantity (IDIQ), Cost-Plus-Fixed-Fee (CPFF) and Cost (no fee) Contract to McKean under solicitation number N66001-21-R-0041. Based on the analysis herein, the recommended awardee's proposal represents the best value to the Government and the proposed cost has been reviewed and determined to be reasonable and realistic. Recommend award be made based on initial offers without discussions as permitted by FAR 15.306(a) and 52.215-1.

(internal reference omitted).

On March 14, 2022, the Navy informed McKean and KOAM that McKean was again the awardee of the contract. On March 29, 2022, KOAM filed another bid protest with GAO and again alleged a conflict of interest and also alleged that the Navy had incorrectly evaluated cost realism. On July 6, 2022, the GAO denied KOAM's protest.

On July 26, 2022, KOAM filed a bid protest complaint in this court, followed by an amended complaint on August 16, 2022. KOAM's amended complaint alleges three counts, first, "the Navy failed to sufficiently investigate the alleged conflict of interest,"

second, "the Navy failed to 'avoid strictly' the appearance of a conflict of interest," and third, "the Navy failed to adjust McKean's 'Combined Technical/Risk Rating' based on the risk of McKean's unrealistic staffing approach." In its request for relief, KOAM seeks:

> 1. A declaratory judgment finding that the Navy failed to sufficiently investigate the alleged conflict of interest, failed to meet its obligation to avoid "strictly" even the appearance of a conflict of interest, and/or failed to properly adjust McKean's "combined technical/risk rating" based on the risk of its unrealistic staffing approach, and further finding that each such failure was arbitrary, capricious, an abuse of discretion, and/or contrary to law; and

> 2. Permanent injunctive relief enjoining the Navy from proceeding with the contract awarded to McKean and ordering the Navy to: (a) terminate the contract awarded to McKean based on the appearance of a conflict of interest, or cancel the Solicitation and start a new procurement with appropriate mitigation techniques to address the apparent conflict of interest, or further investigate the apparent conflict of interest consistent with the Court's decision and make a new award decision; and/or (b) reevaluate and rescore McKean's technical proposal to consider the risk of McKean's unrealistic staffing approach, consistent with the terms of the Solicitation and the Court's decision, and make a new award decision based on that reevaluation; and

> 3. Such other relief as the Court may deem just and proper, including payment of attorney fees pursuant to the Equal Access to Justice Act.

After the complaint was filed, and again after the amended complaint was filed, the court held hearings with the parties and set a schedule to brief cross-motions for judgment on the Administrative Record. In KOAM's motion for judgment on the Administrative Record, protestor argues that "[t]he Navy's investigation failed to reasonably consider whether there was an impermissible appearance of a conflict of interest," and that "[t]he close relationship between a Navy Contractor Officer Representative and a key person for McKean created an appearance of a conflict of interest." (alterations added). Defendant argues that "[t]he Contracting Officer reasonably determined that the apparent personal conflict of interest did not impact the procurement and KOAM's confidential information was not improperly shared with a competitor," and that "[t]he scope of the personal conflict of interest investigation was proper." (alterations added). Intervenor similarly argues that "[t]he Navy's conflict of interest investigation was well-supported, reasonable, and rational," and "[t]he Navy reasonably considered whether there was an impermissible appearance of a conflict of interest." (alterations added).

Separately, KOAM argues "[t]he Navy failed to adjust McKean's 'Combined Technical/Risk Rating' based on the risk of McKean's unrealistic staffing approach," to which defendant responds that "[t]he Agency's Cost Realism analysis was reasonable and in accordance with the Solicitation." (alterations added). Intervenor also argues that "the Navy reasonably found that McKean's technical proposal adhered to the terms of the

RFP and did not pose risk that required rescoring. KOAM's arguments to the contrary are mere disagreement with the Navy's reasoned evaluation determinations and prescribed discretion under the terms of the RFP and the FAR." The parties have fully briefed cross-motions for judgement on the Administrative Record, and the court held oral argument.

## DISCUSSION

As indicated above, the parties have filed cross-motions for judgment on the Administrative Record. Rule 52.1(c)(1) (2021) of the Rules of the United States Court of Federal Claims (RCFC) governs motions for judgment on the administrative record. The court's inquiry is directed to "'whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record.'" Mgmt. & Training Corp. v. United States, 115 Fed. Cl. 26, 40 (2014) (quoting A & D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 131 (2006) see also Superior Optical Labs, Inc. v. United States, 150 Fed. Cl. 681, 691 (2020) (citing Bannum, Inc. v. United States, 404 F.3d 1346, 1356-57 (Fed. Cir. 2005)); see also AAR Manufacturing, Inc. v. United States, 149 Fed. Cl. 514, 522 (2020); Glocoms, Inc. v. United States, 149 Fed. Cl. 725, 731 (2020); Centerra Grp., LLC v. United States, 138 Fed. Cl. 407, 412 (2018) (citing Bannum, Inc. v. United States, 404 F.3d at 1356-57); Informatics Applications Grp., Inc. v. United States, 132 Fed. Cl. 519, 524 (2017) (citation omitted); Strategic Bus. Sols., Inc. v. United States, 129 Fed. Cl. 621, 627 (2016), aff'd, 711 F. App'x 651 (Fed. Cir. 2018); Rotech Healthcare Inc. v. United States, 118 Fed. Cl. 408, 413 (2014); Eco Tour Adventures, Inc. v. United States, 114 Fed. Cl. 6, 21 (2013); DMS All-Star Joint Venture v. United States, 90 Fed. Cl. 653, 661 (2010). Pursuant to RCFC 52.1, in a bid protest, the court reviews the agency's procurement decision to determine whether it is supported by the administrative record. See CW Gov't Travel, Inc. v. United States, 110 Fed. Cl. 462, 481 (2013); see also CR/ZWS LLC v. United States, 138 Fed. Cl. 212, 223 (2018) (citing Bannum, Inc. v. United States, 404 F.3d at 1353-54).

The Administrative Dispute Resolution Act of 1996 (ADRA), Pub. L. No. 104-320, §§ 12(a), 12(b), 110 Stat. 3870, 3874 (1996) (codified at 28 U.S.C. § 1491(b)(1)–(4)), amended the Tucker Act to establish a statutory basis for bid protests in the United States Court of Federal Claims. See Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1330-32 (Fed. Cir. 2001); see also Sys. Application & Techs., Inc. v. United States, 691 F.3d 1374, 1380 (Fed. Cir. 2012) (explaining that the Tucker Act expressly waives sovereign immunity for claims against the United States in bid protests). The statute provides that protests of agency procurement decisions are to be reviewed under APA standards, making applicable the standards outlined in Scanwell Labs., Inc. v. Shaffer, 424 F.2d 859 (D.C. Cir. 1970), and the line of cases following that decision. See, e.g., Per Aarsleff A/S v. United States, 829 F.3d 1303, 1309 (Fed. Cir. 2016) ("Protests of agency procurement decisions are reviewed under the standards set forth in the Administrative Procedure Act ('APA'), see 28 U.S.C. § 1491(b)(4) (citing 5 U.S.C. § 706), 'by which an agency's decision is to be set aside only if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]'" (quoting NVT Techs., Inc. v. United States, 370 F.3d 1153, 1159 (Fed. Cir. 2004)) (citing PAI Corp. v. United States, 614 F.3d 1347, 1351 (Fed. Cir. 2010))); Dell Fed. Sys., L.P. v. United States, 906

F.3d 982, 990 (Fed. Cir. 2018); Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332; Res. Conservation Grp., LLC v. United States, 597 F.3d 1238, 1242 (Fed. Cir. 2010) ("Following passage of the APA in 1946, the District of Columbia Circuit in Scanwell Labs., Inc. v. Shaffer, 424 F.2d 859 (D.C. Cir. 1970), held that challenges to awards of government contracts were reviewable in federal district courts pursuant to the judicial review provisions of the APA."); Galen Med. Assocs., Inc. v. United States, 369 F.3d 1324, 1329 (Fed. Cir.) (citing Scanwell Labs., Inc. v. Shaffer, 424 F.2d at 864, 868, for its "reasoning that suits challenging the award process are in the public interest and disappointed bidders are the parties with an incentive to enforce the law"), reh'g denied (Fed. Cir. 2004). In Banknote Corp. of Am., Inc. v. United States, 365 F.3d 1345 (Fed. Cir. 2004), the Federal Circuit explained that "[u]nder the APA standard as applied in the Scanwell line of cases, and now in ADRA cases, 'a bid award may be set aside if either (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'" Id. at 1351 (quoting Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332)); see also Harmonia Holdings Grp., LLC v. United States, 999 F.3d 1397, 1403 (Fed. Cir. 2021); Palantir USG, Inc. v. United States, 904 F.3d 980, 990 (Fed. Cir. 2018); AgustaWestland North Am., Inc. v. United States, 880 F.3d 1326, 1332 (Fed. Cir. 2018); Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2003).

When discussing the appropriate standard of review for bid protest cases, the United States Court of Appeals for the Federal Circuit addressed subsections (2)(A) and (2)(D) of 5 U.S.C. § 706, see Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332 n.5, but focused its attention primarily on subsection (2)(A). See Croman Corp. v. United States, 724 F.3d 1357, 1363 (Fed. Cir.) ("'[T]he proper standard to be applied [to the merits of] bid protest cases is provided by 5 U.S.C. § 706(2)(A) [(2006)]: a reviewing court shall set aside the agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."'" (alterations in original) (quoting Banknote Corp. of Am. v. United States, 365 F.3d at 1350-51 (citing Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1057-58 (Fed. Cir.), reh'g denied (Fed. Cir. 2000)))), reh'g and reh'g en banc denied (Fed. Cir. 2013). The statute says that agency procurement actions should be set aside when they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D) (2018);[6] see also Veterans

---

[6] The language of 5 U.S.C. § 706 provides in full:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—
>
> (1) compel agency action unlawfully withheld or unreasonably delayed; and
>
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—

Contracting Grp., Inc. v. United States, 920 F.3d 801, 806 (Fed. Cir. 2019) ("In a bid protest, we follow Administrative Procedure Act § 706 and set aside agency action 'if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" (quoting Palladian Partners, Inc. v. United States, 783 F.3d 1243, 1252 (Fed. Cir. 2015)); Tinton Falls Lodging Realty, LLC v. United States, 800 F.3d 1353, 1358 (Fed. Cir. 2015); Orion Tech., Inc. v. United States, 704 F.3d 1344, 1347 (Fed. Cir. 2013); COMINT Sys. Corp. v. United States, 700 F.3d 1377, 1381 (Fed. Cir. 2012) ("We evaluate agency actions according to the standards set forth in the Administrative Procedure Act; namely, for whether they are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" (quoting 5 U.S.C. § 706(2)(A); and Bannum, Inc. v. United States, 404 F.3d at 1351)); Savantage Fin. Servs. Inc., v. United States, 595 F.3d 1282, 1285-86 (Fed. Cir. 2010); Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1358 (Fed. Cir. 2009); Axiom Res. Mgmt., Inc. v. United States, 564 F.3d at 1381 (noting arbitrary and capricious standard set forth in 5 U.S.C. § 706(2)(A), and reaffirming the analysis of Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332); Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308, 1312 (Fed. Cir. 2007) ("'[T]he inquiry is whether the [government]'s procurement decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."'" (quoting Bannum, Inc. v. United States, 404 F.3d at 1351 (quoting 5 U.S.C. § 706(2)(A) (2000)))); NVT Techs., Inc. v. United States, 370 F.3d at 1159 ("Bid protest actions are subject to the standard of review established under section 706 of title 5 of the Administrative Procedure Act ('APA'), 28 U.S.C. § 1491(b)(4) (2000), by which an agency's decision is to be set aside only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' 5 U.S.C. § 706(2)(A) (2000)." (internal citations omitted)); Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319 ("Consequently, our inquiry is whether the Air Force's procurement decision was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' 5 U.S.C. § 706(2)(A) (2000)."); Synergy Sols., Inc. v. United States, 133 Fed. Cl. 716, 734 (2017) (citing Banknote Corp. of Am. v. United States, 365 F.3d at 1350); Eco Tour Adventures, Inc. v. United States, 114 Fed. Cl. at 22; Contracting,

---

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

5 U.S.C. § 706.

Consulting, Eng'g LLC v. United States, 104 Fed. Cl. 334, 340 (2012). "In a bid protest case, the agency's award must be upheld unless it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" Turner Constr. Co. v. United States, 645 F.3d 1377, 1383 (Fed. Cir.) (quoting PAI Corp. v. United States, 614 F.3d at 1351), reh'g en banc denied (Fed. Cir. 2011); see also Tinton Falls Lodging Realty, LLC v. United States, 800 F.3d at 1358 ("In applying this [arbitrary and capricious] standard to bid protests, our task is to determine whether the procurement official's decision lacked a rational basis or the procurement procedure involved a violation of a regulation or procedure." (citing Savantage Fin. Servs., Inc. v. United States, 595 F.3d at 1285-86)); Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d 901, 907 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2013); McVey Co., Inc. v. United States, 111 Fed. Cl. 387, 402 (2013) ("The first step is to demonstrate error, that is, to show that the agency acted in an arbitrary and capricious manner, without a rational basis or contrary to law."); PlanetSpace, Inc. v. United States, 92 Fed. Cl. 520, 531-32 ("Stated another way, a plaintiff must show that the agency's decision either lacked a rational basis or was contrary to law." (citing Weeks Marine, Inc. v. United States, 575 F.3d at 1358)), subsequent determination, 96 Fed. Cl. 119 (2010).

The United States Supreme Court has identified sample grounds which can constitute arbitrary or capricious agency action:

> [W]e will not vacate an agency's decision unless it "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

Nat'l Ass'n of Home Builders v. Defenders of Wildlife, 551 U.S. 644, 658 (2007) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)); see also F.C.C. v. Fox Television Stations, Inc., 556 U.S. 502, 552 (2009); Tinton Falls Lodging Realty, LLC v. United States, 800 F.3d at 1358; Ala. Aircraft Indus., Inc.-Birmingham v. United States, 586 F.3d 1372, 1375 (Fed. Cir. 2009), reh'g and reh'g en banc denied (Fed. Cir. 2010); In re Sang Su Lee, 277 F.3d 1338, 1342 (Fed. Cir. 2002) ("[T]he agency tribunal must present a full and reasoned explanation of its decision. . . . The reviewing court is thus enabled to perform meaningful review . . . ."); Textron, Inc. v. United States, 74 Fed. Cl. 277, 285-86 (2006), appeal dismissed sub nom. Textron, Inc. v. Ocean Technical Servs., Inc., 223 F. App'x 974 (Fed. Cir. 2007). The United States Supreme Court also has cautioned, however, that "courts are not free to impose upon agencies specific procedural requirements that have no basis in the APA." Pension Benefit Guar. Corp. v. LTV Corp., 496 U.S. 633, 654 (1990).

Under an arbitrary or capricious standard, the reviewing court should not substitute its judgment for that of the agency, but should review the basis for the agency decision to determine if it was legally permissible, reasonable, and supported by the facts. See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. at 43 ("The scope of

review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency."); <u>see also Dell Fed. Sys., L.P. v. United States</u>, 906 F.3d 982, 990 (Fed. Cir. 2018); <u>Turner Constr. Co., Inc. v. United States</u>, 645 F.3d at 1383; <u>R & W Flammann GmbH v. United States</u>, 339 F.3d 1320, 1322 (Fed. Cir. 2003) (citing <u>Ray v. Lehman</u>, 55 F.3d 606, 608 (Fed. Cir.), <u>cert.</u> <u>denied</u>, 516 U.S. 916 (1995)); <u>Synergy Sols., Inc. v. United States</u>, 133 Fed. Cl. at 735 (citing <u>Impresa Construzioni Geom. Domenico Garufi v. United States</u>, 238 F.3d at 1332-33). "'"If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations."'" <u>Weeks Marine, Inc. v. United States</u>, 575 F.3d at 1371 (quoting <u>Honeywell, Inc. v. United States</u>, 870 F.2d 644, 648 (Fed. Cir. 1989) (quoting <u>M. Steinthal & Co. v. Seamans</u>, 455 F.2d 1289, 1301 (D.C. Cir. 1971))); <u>Limco Airepair, Inc. v. United States</u>, 130 Fed. Cl. 544, 550 (2017) (citation omitted); <u>Jordan Pond Co., LLC v. United States</u>, 115 Fed. Cl. 623, 631 (2014); <u>Davis Boat Works, Inc. v. United States</u>, 111 Fed. Cl. 342, 349 (2013); <u>Norsat Int'l [America], Inc. v. United States</u>, 111 Fed. Cl. 483, 493 (2013); <u>HP Enter. Servs., LLC v. United States</u>, 104 Fed. Cl. 230, 238 (2012); <u>Vanguard Recovery Assistance v. United States</u>, 101 Fed. Cl. 765, 780 (2011).

Stated otherwise by the United States Supreme Court:

> Section 706(2)(A) requires a finding that the actual choice made was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

<u>Citizens to Pres. Overton Park, Inc. v. Volpe</u>, 401 U.S. 402, 416 (1971) (internal citations omitted), <u>abrogated on other grounds by Califano v. Sanders</u>, 430 U.S. 99 (1977); <u>see also U.S. Postal Serv. v. Gregory</u>, 534 U.S. 1, 6-7 (2001); <u>Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.</u>, 419 U.S. 281, 285 (1974), <u>reh'g denied</u>, 420 U.S. 956 (1975); <u>Co-Steel Raritan, Inc. v. Int'l Trade Comm'n</u>, 357 F.3d 1294, 1309 (Fed. Cir. 2004) (In discussing the "arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with the law" standard, the Federal Circuit stated: "the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency."); <u>In re Sang Su Lee</u>, 277 F.3d at 1342; <u>Advanced Data Concepts, Inc. v. United States</u>, 216 F.3d at 1058 ("The arbitrary and capricious standard applicable here is highly deferential. This standard requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." (citing <u>Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.</u>, 419 U.S. at 285)); <u>Lockheed Missiles & Space Co. v. Bentsen</u>, 4 F.3d 955, 959 (Fed. Cir. 1993); <u>Sys. Studies & Simulation, Inc. v. United States</u>, 146 Fed. Cl. 186, 199 (2019); <u>By Light Prof'l IT Servs., Inc. v. United States</u>, 131 Fed. Cl. 358, 366 (2017); <u>BCPeabody Constr. Servs., Inc. v. United States</u>, 112 Fed. Cl. 502, 508 (2013) ("The court 'is not empowered to substitute its judgment for

that of the agency,' and it must uphold an agency's decision against a challenge if the 'contracting agency provided a coherent and reasonable explanation of its exercise of discretion.'" (internal citations omitted) (quoting Keeton Corrs., Inc. v. United States, 59 Fed. Cl. 753, 755, recons. denied, 60 Fed. Cl. 251 (2004); and Axiom Res. Mgmt., Inc. v. United States, 564 F.3d at 1381)), appeal dismissed, 559 F. App'x 1033 (Fed. Cir. 2014); Supreme Foodservice GmbH v. United States, 109 Fed. Cl. at 382; Alamo Travel Grp., LP v. United States, 108 Fed. Cl. 224, 231 (2012); ManTech Telecomms. & Info. Sys. Corp. v. United States, 49 Fed. Cl. 57, 63 (2001), aff'd, 30 F. App'x 995 (Fed. Cir. 2002).

According to the United States Court of Appeals for the Federal Circuit:

Effective contracting demands broad discretion. Burroughs Corp. v. United States, 223 Ct. Cl. 53, 617 F.2d 590, 598 (1980); Sperry Flight Sys. Div. v. United States, 548 F.2d 915, 921, 212 Ct. Cl. 329 (1977); see NKF Eng'g, Inc. v. United States, 805 F.2d 372, 377 (Fed. Cir. 1986); Tidewater Management Servs., Inc. v. United States, 573 F.2d 65, 73, 216 Ct. Cl. 69 (1978); RADVA Corp. v. United States, 17 Cl. Ct. 812, 819 (1989), aff'd, 914 F.2d 271 (Fed. Cir. 1990). Accordingly, agencies "are entrusted with a good deal of discretion in determining which bid is the most advantageous to the Government." Tidewater Management Servs., 573 F.2d at 73, 216 Ct. Cl. 69.

Lockheed Missiles & Space Co. v. Bentsen, 4 F.3d at 958-59; see also Res-Care, Inc. v. United States, 735 F.3d 1384, 1390 (Fed. Cir.) ("DOL [Department of Labor], as a federal procurement entity, has 'broad discretion to determine what particular method of procurement will be in the best interests of the United States in a particular situation.'" (quoting Tyler Constr. Grp. v. United States, 570 F.3d 1329, 1334 (Fed. Cir. 2009))), reh'g en banc denied (Fed. Cir. 2014); Grumman Data Sys. Corp. v. Dalton, 88 F.3d 990, 995 (Fed. Cir. 1996); Geo-Med, LLC v. United States, 126 Fed. Cl. 440, 449 (2016); Cybertech Grp., Inc. v. United States, 48 Fed. Cl. 638, 646 (2001) ("The court recognizes that the agency possesses wide discretion in the application of procurement regulations.").

Furthermore, according to the United States Court of Appeals for the Federal Circuit:

Contracting officers "are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process." Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (internal quotation marks omitted). Accordingly, procurement decisions are subject to a "highly deferential rational basis review." CHE Consulting, Inc. v. United States, 552 F.3d 1351, 1354 (Fed. Cir. 2008) (internal quotation marks omitted).

PAI Corp. v. United States, 614 F.3d at 1351; see also AgustaWestland N. Am., Inc. v. United States, 880 F.3d at 1332 ("Where, as here, a bid protester challenges the

procurement official's decision as lacking a rational basis, we must determine whether 'the contracting agency provided a coherent and reasonable explanation of its exercise of discretion,' recognizing that 'contracting officers are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process.'" (quoting Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332-33 (internal quotation marks and citation omitted))); Weeks Marine, Inc. v. United States, 575 F.3d at 1368-69 ("We have stated that procurement decisions 'invoke [ ] "highly deferential" rational basis review.' Under that standard, we sustain an agency action 'evincing rational reasoning and consideration of relevant factors.'" (alteration in original) (quoting CHE Consulting, Inc. v. United States, 552 F.3d at 1354 (quoting Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1058))).

"Contracting officers 'are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process,'" PAI Corp. v. United States, 614 F.3d at 1351 (quoting Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332), and "[a]ccordingly, procurement decisions are subject to a 'highly deferential rational basis review.'" Id. (quoting CHE Consulting, Inc. v. United States, 552 F.3d at 1354 (internal quotation marks omitted).

When the contracting officer's discretion grows, so does the burden on the protestor. As noted in D & S Consultants, Inc. v. United States:

> The protestor's burden becomes more difficult the greater the degree of discretion vested in the contracting officer. DynCorp Int'l v. United States, 76 Fed. Cl. 528, 537 (2007). Negotiated procurements afford the contracting officer a "breadth of discretion;" "best-value" awards afford the contracting officer additional discretion. Id. Therefore, in a negotiated, best-value procurement, the "protestor's burden is especially heavy." Id.

D & S Consultants, Inc. v. United States, 101 Fed. Cl. 23, 33 (2011), aff'd, 484 F. App'x 558 (Fed. Cir. 2012); see also Galen Med. Assocs., Inc. v. United States, 369 F.3d at 1330 (noting that contracting officers have great discretion in negotiated procurements but even greater discretion in best-value determinations than in procurements based on cost alone); PHT Supply Corp. v. United States, 71 Fed. Cl. 1, 11 (2006) ("It is critical to note that 'a protestor's burden is particularly great in negotiated procurements because the contracting officer is entrusted with a relatively high degree of discretion, and greater still, where, as here, the procurement is a "best-value" procurement.'" (citations omitted)). "It is well-established that contracting officers have a great deal of discretion in making contract award decisions, particularly when, as here, the contract is to be awarded to the bidder or bidders that will provide the agency with the best value." Banknote Corp. of Am. Inc. v. United States, 365 F.3d at 1355 (citing TRW, Inc. v. Unisys Corp., 98 F.3d 1325, 1327-28 (Fed. Cir. 1996); E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996); Lockheed Missiles & Space Co. v. Bentsen, 4 F.3d at 958–59); see also Am. Tel. & Tel. Co. v. United States, 307 F.3d 1374, 1379 (Fed. Cir. 2002); Lockheed Missiles & Space Co. v. Bentsen, 4 F.3d at 958; Brooks Range Contract Servs., Inc. v. United States, 101 Fed. Cl. 699, 707 (2011) ("[A] plaintiff's burden 'is elevated where the solicitation

contemplates award on a "best value" basis.'" (internal citations omitted)); <u>Matt Martin Real Estate Mgmt. LLC v. United States</u>, 96 Fed. Cl. 106, 113 (2010); <u>Serco v. United States</u>, 81 Fed. Cl. 463, 496 (2008) ("To be sure, as noted at the outset, plaintiffs have a significant burden of showing error in that regard because a court must accord considerable deference to an agency's best-value decision in trading off price with other factors.").

A disappointed bidder has the burden of demonstrating the arbitrary and capricious nature of the agency decision by a preponderance of the evidence. <u>See</u> <u>Tinton Fall Lodging Realty, LLC v. United Sates</u>, 800 F.3d at 1364; <u>see</u> <u>also</u> <u>Grumman Data Sys. Corp. v. Dalton</u>, 88 F.3d at 995-96; <u>Enhanced Veterans Sols., Inc. v. United States</u>, 131 Fed. Cl. 565, 578 (2017); <u>Davis Boat Works, Inc. v. United States</u>, 111 Fed. Cl. at 349; <u>Contracting, Consulting, Eng'g LLC v. United States</u>, 104 Fed. Cl. at 340. The Federal Circuit has indicated that "[t]his court will not overturn a contracting officer's determination unless it is arbitrary, capricious, or otherwise contrary to law. To demonstrate that such a determination is arbitrary or capricious, a protester must identify 'hard facts'; a mere inference or suspicion . . . is not enough." <u>PAI Corp. v. United States</u>, 614 F.3d at 1352 (citing <u>John C. Grimberg Co. v. United States</u>, 185 F.3d 1297, 1300 (Fed. Cir. 1999)); <u>see also</u> <u>Turner Constr. Co., Inc. v. United States</u>, 645 F.3d at 1387; <u>Sierra Nevada Corp. v. United States</u>, 107 Fed. Cl. 735, 759 (2012); <u>Filtration Dev. Co., LLC v. United States</u>, 60 Fed. Cl. 371, 380 (2004).

> A bid protest proceeds in two steps. First . . . the trial court determines whether the government acted without rational basis or contrary to law when evaluating the bids and awarding the contract. Second . . . if the trial court finds that the government's conduct fails the APA review under 5 U.S.C. § 706(2)(A), then it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct.

<u>Bannum, Inc. v. United States</u>, 404 F.3d at 1351; <u>T Square Logistics Servs. Corp. v. United States</u>, 134 Fed. Cl. 550, 555 (2017); <u>FirstLine Transp. Sec., Inc. v. United States</u>, 119 Fed. Cl. 116, 126 (2014), <u>appeal dismissed</u> (Fed. Cir. 2015); <u>Eco Tour Adventures, Inc. v. United States</u>, 114 Fed. Cl. at 22; <u>Archura LLC v. United States</u>, 112 Fed. Cl. at 496. To prevail in a bid protest case, the protestor not only must show that the government's actions were arbitrary, capricious, or otherwise not in accordance with the law, but the protestor also must show that it was prejudiced by the government's actions. <u>See</u> 5 U.S.C. § 706 ("[D]ue account shall be taken of the rule of prejudicial error."); <u>see also</u> <u>Glenn Def. Marine (ASIA), PTE Ltd. v. United States</u>, 720 F.3d at 907 ("In a bid protest case, the inquiry is whether the agency's action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and, if so, whether the error is prejudicial."); <u>IT Enter. Sols. JV, LLC v. United States</u>, 132 Fed. Cl. 158, 173 (2017) (citing <u>Bannum v. United States</u>, 404 F.3d at 1357-58). In describing the prejudice requirement, the Federal Circuit also has held that:

> To prevail in a bid protest, a protester must show a significant, prejudicial error in the procurement process. <u>See</u> <u>Statistica, Inc. v. Christopher</u>, 102

F.3d 1577, 1581 (Fed. Cir. 1996); <u>Data Gen. Corp. v. Johnson</u>, 78 F.3d 1556, 1562 (Fed. Cir. 1996). "To establish prejudice, a protester is not required to show that but for the alleged error, the protester would have been awarded the contract." <u>Data General</u>, 78 F.3d at 1562 (citation omitted). Rather, the protester must show "that there was a substantial chance it would have received the contract award but for that error." <u>Statistica</u>, 102 F.3d at 1582; <u>see</u> <u>CACI, Inc.-Fed. v. United States</u>, 719 F.2d 1567, 1574-75 (Fed. Cir. 1983) (to establish competitive prejudice, protester must demonstrate that but for the alleged error, "'there was a substantial chance that [it] would receive an award--that it was within the zone of active consideration.'" (citation omitted)).

<u>Alfa Laval Separation, Inc. v. United States</u>, 175 F.3d 1365, 1367 (Fed. Cir.), <u>reh'g</u> <u>denied</u> (Fed. Cir. 1999); <u>see also</u> <u>Glenn Def. Marine (ASIA), PTE Ltd. v. United States</u>, 720 F.3d at 912; <u>Allied Tech. Grp., Inc. v. United States</u>, 649 F.3d 1320, 1326 (Fed. Cir.), <u>reh'g</u> <u>en</u> <u>banc</u> <u>denied</u> (Fed. Cir. 2011); <u>Info. Tech. & Applications Corp. v. United States</u>, 316 F.3d at 1319; <u>Impresa Construzioni Geom. Domenico Garufi v. United States</u>, 238 F.3d at 1332-33; <u>OMV Med., Inc. v. United States</u>, 219 F.3d 1337, 1342 (Fed. Cir. 2000); <u>Advanced Data Concepts, Inc. v. United States</u>, 216 F.3d at 1057; <u>Stratos Mobile Networks USA, LLC v. United States</u>, 213 F.3d 1375, 1380 (Fed. Cir. 2000).

<u>Conflict of Interest</u>

Protestor first argue that "[t]he Navy did not meet its obligation to strictly avoid even the appearance of a conflict of interest, but instead considered only whether an actual conflict had been proven," and contends, that "[i]f the high standards of conduct that the Government has established for Federal procurement are to mean anything, they must be followed. Here, the Navy did not meet these standards."[7] (alterations added). KOAM also argues the "Navy's personal conflict of interest analysis, 'entirely failed to consider an important aspect of the problem,' because it failed to reasonably consider whether there was an appearance of a conflict of interest, as opposed to an actual conflict, that the Navy was required to strictly avoid pursuant to FAR 3.101-1." (quoting <u>Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.</u>, 463 U.S. at 43) (internal refence omitted).

This court is cognizant of the Federal Circuit's indication that "the FAR recognizes that the identification of OCIs and the evaluation of mitigation proposals are fact-specific inquiries that require the exercise of considerable discretion." <u>Axiom Res. Mgmt., Inc. v. United States</u>, 564 F.3d at 1381-82 (citing FAR § 9.505).

As recently explained by the United States Court of Appeals for the Federal Circuit:

---

[7] At the oral argument, counsel of record for protestor confirmed that protestor only raised an apparent conflict of interest, explaining: "We are alleging that the Navy had an obligation to evaluate whether there was an appearance of a conflict of interest and to strictly limit the appearance of a conflict of interest. We are not alleging that there is an actual conflict of interest."

The standard for Claims Court review of a contracting officer's decision with regard to a conflict of interest is highly deferential. A contracting officer's conflict of interest determination will be upheld unless it is "arbitrary, capricious, or otherwise contrary to law." PAI Corp. v. United States, 614 F.3d 1347, 1352 (Fed. Cir. 2010). If the contracting officer's findings are rational, they will be upheld on judicial review. See Turner Constr. Co. v. United States, 645 F.3d 1377, 1383–87 (Fed. Cir. 2011).

Oracle Am., Inc. v. United States, 975 F.3d 1279, 1296 (Fed. Cir. 2020), cert. denied, 142 S. Ct. 68 (2021); see also Turner Constr. Co. v. United States, 645 F.3d at 1386 (citing PAI Corp. v. United States, 614 F.3d at 1352) ("The CO has considerable discretion in determining whether a conflict is significant."); see also Parcel 49C Ltd. P'ship v. United States, 130 Fed. Cl. 109, 123 (2016) (citing PAI Corp. v. United States, 614 F.3d at 1352).

Additionally, a Judge of the United States Court of Federal Claims explained:

As with all agency decision-making, the Court must analyze whether the Agency conducted an adequate investigation consistent with the arbitrary and capricious standard of review. See PAI Corp. v. United States, 614 F.3d 1347, 1352–53 (Fed. Cir. 2010) (reviewing conflict of intertest investigation under APA standard); cf. Former Emps. of Ameriphone, Inc. v. United States, 288 F. Supp. 2d 1353, 1355 (C.I.T. 2003) ("Courts have not hesitated to set aside agency determinations which are the product of perfunctory investigations." (footnote omitted)). Notwithstanding the significant discretion vested in procurement officials, this Court must ascertain whether there exists a "rational connection between the facts found and the choice made." Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43, 103 S. Ct. 2856 (internal quotation marks omitted).

Oak Grove Techs., LLC v. United States, 155 Fed. Cl. 84, 115–16 (2021). As noted by a Judge of this court:

The United States Court of Appeals for the Federal Circuit has held that an agency can base a decision to disqualify a bidder on the appearance of impropriety. See NKFEngineering, Inc. v. United States, 805 F.2d 372, 376 (Fed. Cir. 1986). Whether there is an appearance of impropriety sufficient to disqualify a bidder "depend[s] upon the circumstances in each case." Id. There is no appearance of impropriety when "[a] disinterested observer knowing all the facts and the applicable law would see nothing improper." R & W Flammann GmbH v. United States, 339 F.3d 1320, 1324 (Fed. Cir. 2003). But, an appearance of impropriety must be based on "hard facts" and not "suspicion and innuendo." CACI, Inc.–Fed. v. United States, 719 F.2d 1567, 1581–82 (Fed. Cir. 1983); see also Harkcon, Inc. v. United States, 133 Fed. Cl. 441, 463–64 (Fed. Cl. 2017) (applying the "hard facts" standard to an appearance of impropriety claim).

43

Partner 4 Recovery v. United States, 141 Fed. Cl. 89, 131 (2018) (footnote omitted); Sys. Plus, Inc. v. United States, 69 Fed. Cl. 757, 768 (2006) (citing NKFEngineering, Inc. v. United States, 805 F.2d at 376-78) ("Even though the appearance of impropriety can be a valid reason for disqualifying an offeror, the appearance of impropriety must be based on actual facts.").

KOAM argues "the Navy was required to strictly avoid" an appearance of a conflict of interest "pursuant to FAR 3.101-1." FAR 3.101-1 provides:

> Government business shall be conducted in a manner above reproach and, except as authorized by statute or regulation, with complete impartiality and with preferential treatment for none. Transactions relating to the expenditure of public funds require the highest degree of public trust and an impeccable standard of conduct. The general rule is to avoid strictly any conflict of interest or even the appearance of a conflict of interest in Government-contractor relationships. While many Federal laws and regulations place restrictions on the actions of Government personnel, their official conduct must, in addition, be such that they would have no reluctance to make a full public disclosure of their actions.

48 C.F.R. § 3.101-1 (2021); see also Lawrence Battelle, Inc. v. United States, 117 Fed. Cl. 579, 583 n.4 (2014). Oak Grove Techs., LLC v. United States, 155 Fed. Cl. at 115 ("This FAR provision further instructs that '[t]he general rule is to avoid strictly any conflict of interest *or even the appearance of a conflict of interest in Government-contractor relationships.*' FAR 3.101-1.") (emphasis in original).

As discussed above, on February 24, 2022, the contracting officer issued the Personal Conflict of Interest Memorandum and, the contracting officer concluded: "I find no conflict of interest affecting the award to McKean." The contracting officer "found no evidence" that "Ms. Saucedo participated personally and substantially in the NIEF Engineering source selection, including development of the statement of work, drafting of the source selection strategy, request for proposals, or participated in the evaluation of proposals resulting in the NIEF Contract awarded to McKean," or that "Ms. Saucedo disclosed any competitively useful nonpublic information." The contracting officer also determined:

> I also found no evidence that Ms. Saucedo provided contractor bid or proposal information or source selection information to McKean before the award or that McKean obtained contractor bid or proposal information or source selection information before the award. Therefore, I find "no impact" on the award of the contract to McKean in accordance with FAR 3.104-7(a). Additionally, as discussed above, even if there were disclosure of cost information as alleged by KES, I do not believe that such cost information would have provided a competitive advantage due to the nature of the cost evaluation. Although some may believe there is an appearance of impropriety based upon Ms. Saucedo's position as COR and her relationship with a McKean employee, the above information, findings and

conclusions, do not support any actual impropriety. I do not believe the appearance of impropriety by itself sufficient to impact the award of the contract to McKean given all of the above.

KOAM states "[t]he Navy's PCI Memorandum reached six conclusions," as described immediately above, and "[t]he Navy's first four conclusions, as documented in paragraphs 35 and 36 of the PCI Memorandum, addressed whether Ms. Saucedo and McKean acted in a criminal manner and whether McKean had an unfair competitive advantage."[8] Protestor argues

> it was important for the Navy to consider whether Ms. Saucedo or McKean acted in a criminal manner and whether McKean had an unfair competitive advantage, such findings do <u>not</u> address whether there was an appearance of a conflict of interest that the Navy was required to strictly avoid under FAR 3.101-1 and would not negate a finding of an appearance of a conflict of interest.

(emphasis in original; alterations added). Protestor continues:

> The Navy's fifth and sixth conclusions, as documented in paragraph 37 of the PCI Memorandum, similarly miss the mark.[[9]] The only statement in the

---

[8] Specifically, according to KOAM, the first four conclusions in the personal conflict of interest memorandum were:

> (1) Ms. Saucedo did not participate "personally and substantially" in the source selection; (2) Ms. Saucedo did not disclose "competitively useful nonpublic information"; (3) Ms. Saucedo did not provide "bid or proposal information or source selection information to McKean" and McKean did not otherwise obtain such information prior to award; (4) even if disclosure of such information occurred, the information would not provide a "competitive advantage" to McKean[.]

(internal references omitted; alteration added).

[9] Protestor claims the five and sixth conclusions in the personal conflict of interest memorandum were

> (5) "[a]lthough some may believe there is an appearance of impropriety based upon Ms. Saucedo's position as COR and her relationship with a McKean employee, the above information, findings and conclusions, do not support any actual impropriety"; and (6) "I do not believe the appearance of impropriety by itself sufficient to impact the award of the contract to McKean given all of the above[.]"

(internal reference omitted; first alteration in original).

PCI Memorandum that attempted to address whether there was an appearance of a conflict was the Contracting Officer's conclusory statement that he did "not believe the appearance of impropriety by itself sufficient to impact the award of the contract to McKean given all of the above." The Contracting Officer appears to be acknowledging that an "appearance of impropriety" exists, yet asserting that the appearance is not "sufficient to impact the award" to McKean. The Contracting Officer's conclusion regarding the impact appears to be based on the immediately preceding sentence, which provides that, "[a]lthough some may believe there is an appearance of impropriety based upon Ms. Saucedo's position as COR and her relationship with a McKean employee, the above information, findings and conclusions, do not support any actual impropriety." The "above information, findings and conclusions" refer to the first four conclusions, which, as discussed, only addressed whether Ms. Saucedo and McKean acted in a criminal manner and whether McKean had an unfair competitive advantage under FAR 9.505(b). By focusing on whether there was "any actual impropriety," and basing the conclusion of whether there was an <u>appearance</u> of impropriety on whether there was an actual impropriety, the Navy entirely failed to consider an important aspect of the problem.

(emphasis in original; internal references omitted). Therefore, protestor argues: "Allowing the Navy to find that there was no appearance of a conflict of interest based on the alleged lack of an actual conflict would essentially read the 'appearance of a conflict of interest' language out of FAR 3.101-1." Intervenor argues

KOAM's argument that these six conclusions prove that the Agency did not consider whether there was an appearance of a COI is disproven by the plain language of the PCI Memorandum; the Navy obviously considered whether there was an appearance of impropriety given this concept is mentioned multiple times in the PCI Memorandum:

Although ***some may believe there is an appearance of impropriety*** based upon Ms. Saucedo's position as COR and her relationship with a McKean employee, the above information, findings and conclusions, do not support any actual impropriety.

Tab 36c at AR2746 (emphases added); <u>see</u> <u>id.</u> at 2738. KOAM merely disagrees with the Navy's conclusion that there was no appearance of a COI—a determination found reasonable by the GAO. While KOAM attempts to treat the CO's statement contained in the PCI Memorandum explaining that "I do not believe the appearance of impropriety by itself sufficient to impact the award of the contract to McKean given all of the above" as an admission that an appearance of a conflict exists, this argument completely ignores the preceding sentence in the PCI Memorandum, noting that while

"some may believe there is an appearance of impropriety," the CO himself did not.

(emphasis in original). Protestor responds

> The referenced quotation from the PCI Memorandum, however, does not demonstrate that the Navy considered whether there was an <u>appearance</u> of impropriety that it needed to strictly avoid. As discussed above, "a factual inquiry into whether an actual impropriety has transpired is unnecessary" because the issue is whether the facts support an appearance of an impropriety, not whether there is an actual impropriety. <u>See</u> <u>Compliance Corp.</u>, 22 Cl. Ct. at 199. Thus, the Navy's conclusion regarding an actual impropriety in no way answers the question of whether there was an <u>appearance</u> of an impropriety that the Navy needed to strictly avoid. Moreover, the Navy was required to undertake the appearance analysis in order to determine whether it had complied with FAR 3.101-1, and it was, therefore, arbitrary and capricious for the Navy to fail to do so.

(emphasis in original). As noted by defendant,

> KOAM unreasonably faults the Navy for not conducting a separate "appearance analysis" of impropriety to determine whether there was an appearance of a COI rather than an actual COI. KOAM Reply at 15-16. Common sense dictates that if an appearance of a COI is alleged, then an investigation must necessarily consider whether there is an actual COI. In its one-page argument, KOAM tellingly offers no suggestions on how the Court could even differentiate an apparent COI investigation from that of an actual COI investigation. <u>Id.</u> Perhaps that is because an appearance of a COI investigation is necessarily subsumed into an actual COI investigation; thus, the Court should reject this argument.

KOAM does not explain what a separate "appearance analysis" would encompass, or how it would differ from the conflict of interest investigation undertaken by the contracting officer in the above captioned bid protest except to conduct in-person interviews of Mr. and Ms. Saucedo rather than accepting sworn declarations, in-depth email review, and consultation with a designated agency ethics official.[10] Although a contracting officer's conflict of interest investigation and conclusions about possible conflicts can prove to be insufficient, based on the facts presented, the court does not create a blanket rule that any conflict of interest investigation must be segregated into an actual conflict investigation and an apparent conflict investigation. Nor can the court determine, as argued by KOAM, that based on the contracting officer's investigation and conclusions that no investigation into an apparent conflict of interest occurred. As identified at the end of the contracting officer's analysis, the contracting officer in the above captioned protest indicated, perhaps with inartful wording:

---

[10] As discussed below, KOAM challenges these aspects of the contracting officer's conflict of interest investigation.

Although some may believe there is an appearance of impropriety based upon Ms. Saucedo's position as COR and her relationship with a McKean employee, the above information, findings and conclusions, do not support any actual impropriety. I do not believe the appearance of impropriety by itself sufficient to impact the award of the contract to McKean given all of the above.

The court interprets "given all of the above" to refer to all the findings made by the contracting officer and any possible impact on the procurement discussed in the lengthy Personal Conflict of Interest Memorandum.

Furthermore, the beginning of the analysis in the Personal Conflict of Interest Memorandum cited to the statutory and regulatory guidance for both actual and apparent conflicts of interest. The Personal Conflict of Interest Memorandum stated:

**PCI ANALYSIS**

**Authority:** 41 U.S.C., Chapter 21, Restrictions on Obtaining and Disclosing Certain Information, Federal Acquisition Regulation (FAR) Part 3.1; 18 U.S.C. § 208 Acts affecting a personal financial interest, 5 CFR Part 2635. Additionally, the following is a brief overview of some of the main regulations relevant to this analysis:

1. FAR 2.101, which implements 41 U.S.C. § 2101, defines "Source Selection Information" to include: "Other information marked as 'Source Selection Information – See FAR 2.101 and 3.104' based on a case-by-case determination by the head of the agency or the contracting officer, that its disclosure would jeopardize the integrity or successful completion of the Federal agency procurement to which the information relates."

2. FAR Subpart 3.101-1 states: "Government business shall be conducted in a manner above reproach and, except as authorized by statute or regulation, with complete impartiality and with preferential treatment for none. Transactions relating to the expenditure of public funds require the highest degree of public trust and an impeccable standard of conduct. The general rule is to avoid strictly any conflict of interest or even the appearance of a conflict of interest in Government-contractor relationships. While many Federal laws and regulations place restrictions on the actions of Government personnel, their official conduct must, in addition, be such that they would have no reluctance to make a full public disclosure of their actions."

(capitalization and emphasis in original). The contracting officer was aware and considered 18 U.S.C. § 208, FAR Part 3.1, and FAR 3.101-1 when conducting his conflict of interest investigation.

Turning to the specific facts of the award to McKean, KOAM also argues:

The administrative record reflects that there was the appearance of a significant personal conflict of interest that was based on the fact that McKean drafted its proposal with assistance from a key person (*i.e.*, Mr. Saucedo) who was married to, living with, and working in the same house as a Navy Contracting Officer Representative (*i.e.*, Ms. Saucedo) who had ongoing access to, and knowledge of, KOAM's confidential cost and pricing data and contract performance data, as well as source selection information relating to the procurement under the Solicitation.

(emphasis in original). In response, defendant argues that "the Court should find that there is not a shred of evidence that Ms. Saucedo shared proprietary information with her husband." Intervenor argues "[d]espite KOAM's unsupported claims to the contrary, the Agency properly determined there was no conflict surrounding Mr. and Ms. Saucedo's marriage." (alteration added).

Protestor cites to no regulation or statute that provides marriage, or individuals living shared quarters, creates an apparent conflict of interest in and of itself. In the above captioned protest, Mr. and Ms. Saucedo took a number of steps to avoid even the appearance of a conflict of interest, specifically, separate home office spaces, restricted access to Ms. Saucedo's computer, seriously restricting discussion of her work, and awareness by Ms. Saucedo's colleagues of Mr. Saucedo's employment. The court acknowledges the language in the recent United States Court of Federal Claims decision in Appsential , LLC v. United States, stated: "Appsential is correct that a marriage between an agency employee and an employee of an offeror could create the appearance of a conflict of interest, as noted by the contracting officer." Appsential, LLC v. United States, 153 Fed. Cl. 610, 619 (2021). In Appsential, however, the court explained the individuals were

[***], a division director in DOE's [Department of Energy's] Office of the Chief Financial Officer, is married to [***], who is a Principal Solutions Architect at GDIT [General Dynamics Information Technology, Inc.]. Early on, [***] was involved in drafting and reviewing documents related to this solicitation. [***], specifically, "provided input into one of the six order Performance Work Statements ... and reviewed the Independent Government Cost Estimate" between March and May of 2018.

Id. at 618 (second and fourth alterations added; internal references omitted). The individuals in Appsential, therefore, appeared to have been critically involved in the procurement for both the government and an offeror with one individual drafting documents related to the solicitation and reviewing the Independent Government Cost Estimate before the Department of Energy issued a request for quotations for the solicitation at issue in Appsential. After recusals of one of the individuals in Appsential:

The contracting officer conducted a review of the potential OCI on February 4, 2020. The contracting officer interviewed [***], reviewed the documents that [***] had worked on, and discussed the situation with the prior contracting officer. While the contracting officer determined that there were "no substantial changes" in the documents between the time [***] worked on the documents and when the RFQ was publicly released in November 2019, the documents had gone "through multiple subsequent reviews" following [***]'s recusal, "and contain[ed] similar requirements to prior IT contracts issued to meet DOE's needs," Ultimately, the contracting officer determined that there was no "substantial risk to the integrity of the competition, or unfair competitive advantage, nor [was] there risk to the government that could outweigh a potential award to GDIT."

Id. (alterations in original; internal references omitted). The Judge in Appsential ultimately reasoned:

The contracting officer determined, after review of the circumstances, that "no additional steps [needed] to be taken to mitigate this possible OCI." The court does not find that the contracting officer's decision was unreasonable. The administrative record indicates that the prior contracting officer did not believe additional actions were necessary beyond [***]'s recusal. Additionally, the contracting officer thoroughly investigated the matter, determined that mitigation efforts already taken were sufficient, and recommended additional steps should GDIT be awarded the contract. While Appsential suggests additional steps that the contracting officer could have taken, the absence of these actions no not render the contracting officer's conclusion arbitrary and capricious.

Id. at 619 (alterations in original; internal references and footnote omitted). Therefore, the Judge in Appsential concluded: "Without more than this speculation, Appsential has failed to meet its burden of identifying the requisite facts in the administrative record that support its claim that GDIT had an unequal access to information OCI." Id.

In the bid protest now under review in this court, there is no suggestion that either Mr. Saucedo or Ms. Saucedo was as critical to the procurement as the individuals in Appsential, which is borne out by the information in Ms. Saucedo's initial response to the Navy's email questions and in the sworn declarations of both Mr. Saucedo and Ms. Saucedo, nor has KOAM presented any hard information that either Mr. Saucedo or Ms. Saucedo played a critical role during the development of the RFP or the evaluation of the proposals received, as discussed below. In his sworn declaration, Mr. Saucedo notes that "I have never served as an executive of McKean Defense Group, LLC or Noblis. Instead, I am a Senior Systems Engineer. In its proposal in response to the Solicitation, Noblis proposed me in a key personnel role as Senior Systems Engineer." Mr. Saucedo further declared:

16. In the Summer of 2021, I provided input on discrete technical matters during the drafting of McKean Defense's (now Noblis) technical proposal

submitted in response to the Solicitation. Specifically, I provided early input regarding rack configuration and installation technical drawings, system development, and installation processes given my expertise as a production engineer. While the inputs I provided on such technical matters were used to draft portions of Noblis' technical proposal, I did not myself draft the final technical section of the proposal, nor did I review the technical proposal before submission.

17. I was never contacted or asked to provide any input whatsoever on Noblis' cost/price proposal submitted in response to the Solicitation, nor did I ever provide any input on the cost/price proposal whatsoever. I neither viewed nor had access to Noblis' cost/price proposal or any cost details used as inputs for that cost/price proposal prior to submission. In fact, to this day I have never seen the details of this cost/price proposal.

18. I was not involved in any way in Noblis' decision to compete under the Solicitation.

Ms. Saucedo declared in her declaration:

I did not have any involvement in drafting the requirements for Request for Proposal (RFP) N66001-21-R-0041, nor did I have access to the solicitation package. I did not have any role/involvement or have any discussion/access to information related to the requirements, development of the RFP/solicitation, Independent Government Cost Estimate (IGCE), acquisition strategy, development of source selection criteria, evaluation of proposals or the award decision.

Protestor, in its motion for judgment on the Administrative Record, however, cites to the following what it describes as "hard facts," to demonstrate there was an appearance of a conflict of interest in this protest: "Mr. Saucedo was involved in the preparation of McKean's proposal submitted in response to the Solicitation," "Ms. Saucedo had access to KOAM's cost and pricing data and performance data under the incumbent contract," and "Ms. Saucedo was involved in, and had access to information relating to, the Navy's procurement under the Solicitation, including source selection information." From these facts, protestor argues:

In sum, Ms. Saucedo's access to KOAM's incumbent rate and performance information and her access to sensitive information regarding, and involvement in, the Navy's procurement under the Solicitation, coupled with her husband's involvement in the preparation of the awardee's proposal and role as a key personnel, created an appearance of a conflict of interest that the Navy, pursuant to FAR 3.101-1, should have strictly avoided. Given that the Saucedos were working full-time in their shared home throughout the procurement, Ms. Saucedo could have easily shared the information with Mr. Saucedo.

Defendant responds that

> the record contains no hard facts that Mr. Saucedo gained access to KOAM's incumbent information. Although Mr. Saucedo confirmed he had some input on some engineering aspects of McKean's proposals and was listed as a key person as a senior systems engineer, he declared under oath that he did not talk about McKean's proposal with his wife and had no input on McKean's cost proposal. Nor did he discuss any of the cost aspects of KOAM's incumbent contract with his wife, *or* have any access to his wife's Navy computer, despite working from the same home during the COVID-19 pandemic.

(emphasis in original; internal references omitted). In his sworn declaration, Mr. Saucedo declared:

> 8. My wife and I do not discuss her management of contracts. Accordingly, I am not aware of my wife's specific duties as a COR regarding administration of KES's *incumbent* contract. I **do** know that she has *never* shared with me any proprietary or sensitive information of a contractor that she oversees, including KES.

> **Access to or Knowledge of KES's Proposal**

> 9. KES's protest alleges that "[a]s a COR for the incumbent contract, [redacted], [she] may have participated personally and substantially in the subject procurement . . ." That allegation is incorrect. Redacted Protest at 28. My wife and I do not discuss her role, if any, in the evaluation of proposals or award decision resulting in a contract being awarded to Noblis under the *current Solicitation.*

> 10. I have never had access to, viewed, nor possessed any portion of or information regarding KES's proposal for the NIEF contract at any time, either under the incumbent effort or the proposal KES submitted under current Solicitation for this effort.

> 11. My wife and I have not discussed KES's proposal under the current Solicitation. To the best of my knowledge, my wife is not involved in the protested procurement and I am not aware that she has access to KES's proposal or the evaluation thereof. Nor have I ever received or been told any information regarding KES's price or costs under KES's incumbent contract by my wife.

(capitalization and emphasis in original).

Additionally, defendant challenges KOAM's "hard facts" by arguing that

there is nothing to support KOAM's argument that Ms. Saucedo's access to information under its incumbent contract presents an appearance of a conflict of interest. It is undisputed that as one of eight to nine contracting officer representatives under the KOAM incumbent contract, Ms. Saucedo would have had access to the task orders she oversaw. But KOAM points to *no* hard facts that she actually shared *any* proprietary information with her husband gleaned from her role as a contracting officer representative; rather, the only evidence is that Ms. Saucedo cooperated with full candor within 24 hours to responding to a series of questions, *and* that both Mr. and Ms. Saucedo declared under oath that Ms. Saucedo has never shared any proprietary information.

(emphasis in original; internal references omitted). As referenced above, in response to the questions raised by the contract specialist: "Did you ever discuss your work as a COR on the KES contract with Mr. Saucedo? How often? What types of things concerning the contract were discussed?" Ms. Saucedo responded: "The only thing I have discussed with Mr. Saucedo regarding my work at the NIEF is high level project details, never have discussed my role as COR or the details of that work." Similarly, in response to the contract specialist questions: "What non-public information, if any, did you share with Mr. Saucedo and when? For example, did you ever discuss labor rates such as pay between KES and McKean?" Ms. Saucedo answered: "I have never discussed any labor rates or any other financial contract information with Mr. Saucedo." In her declaration, under penalty of perjury, Ms. Saucedo stated:

> I have never discussed my role as COR or the details of that work with my husband. I have never disclosed any third party proprietary information, like KES or its subcontractors' labor rates, or any other financial or contract information with Mr. Saucedo. The only thing I have discussed with Mr. Saucedo regarding my work at the NIEF is very high-level project details.

In Mr. Saucedo's declaration, under penalty of perjury, he stated:

> My wife and I do not discuss her management of contracts. Accordingly, I am not aware of my wife's specific duties as a COR regarding administration of KES's ***incumbent*** contract. I **do** know that she has ***never*** shared with me any proprietary or sensitive information of a contractor that she oversees, including KES.

Separately, KOAM argues

The Independent Government Cost Estimate that Ms. Saucedo had access to also was competitively valuable. The Independent Government Cost Estimate, which was not disclosed to offerors, utilized historical pricing information from the incumbent contract to provide a forecasted value of $221,340,961.00 for the procurement. Tab 36.a at AR 2634. Having access

to the Independent Government Cost Estimate, or knowledge of the estimated value, would have provided McKean with a benchmark in terms of price.

The court notes that protestor does not cite to any "hard facts" that suggest Ms. Saucedo provided the Independent Government Cost Estimate to Mr. Saucedo. Intervenor notes that protestor's argument relies in part on a PowerPoint presentation, which as intervenor argues, took place "three months after the Agency received KOAM's and McKean's cost proposal." Intervenor also argues that

> [w]hile KOAM asserts that the presentation contains source selection information, it is **neither** marked as containing source selection sensitive information, nor does it reference an IGCE. Rather, it contains only a bottom-line "predicted value" of the Solicitation in the amount of $221M, which is $341K **lower than** the IGCE of $221,340,961. This chart does not support KOAM's assertion, and is not a "hard fact" proving a COI. Notably, KOAM has not explained how it would have been prejudiced by Ms. Saucedo's knowledge of a "predicted value" of the procurement shared three months after final proposals were submitted, where (1) the RFP provided that an offeror's cost would be evaluated on adjusted rather than proposed costs, (2) for all but three employees, McKean proposed its employees actual salaries, and (3) offerors did not have the opportunity to amend their proposed approaches or costs following the presentation. Moreover, KOAM cannot demonstrate prejudice where both it and McKean's proposed and evaluated costs were significantly below the IGCE.

(emphasis in original; internal references omitted; alteration added). Defendant also argues "it was not improper for Ms. Saucedo to have access to the *estimated* value of the IGCE, because there was similarly *no* evidence that she had access to the IGCE itself." (emphasis in original). The court finds no basis to question the contracting officer's conclusions in the Personal Conflict of Interest Memorandum regarding Ms. Saucedo's access to relevant information about the RFP including the Independent Government Cost Estimate.

> KOAM separately suggests

> the Navy was not aware of the potential conflict of interest prior to award because neither Ms. Saucedo, nor McKean, raised the potential issue, even though "Ms. Saucedo was aware of Mr. Saucedo's company competing on the requirement.". Ms. Saucedo's lack of candor regarding her potential financial interest in an award to McKean further contributed to the appearance of a personal conflict of interest.

(internal references and footnote omitted). The court notes that the contracting officer's conclusions in the Personal Conflict of Interest Memorandum stated:

The PCI investigation revealed that although Ms. Saucedo has not discussed Mr. Saucedo's job with her co-workers, Ms. Saucedo along with some fellow co-workers knew he worked for Cabrillo, which is a unit within McKean and now owned by Noblis-MSD. Mr. Saucedo does not work on any projects or programs that Ms. Saucedo is involved in with the NIEF.

The PCI investigation revealed Ms. Saucedo was aware of Mr. Saucedo's company competing on the requirement. Ms. Saucedo stated, "I did know the company was developing a proposal for this contract, Mr. Saucedo told me. I am not sure when the contract actually went out for bidding but I knew before the proposal was submitted. Other than knowing they were developing a proposal, we did not have any other discussion about the contract."

In addition, intervenor argues that "Ms. Saucedo did disclose Mr. Saucedo's employment annually on her Office of Government Ethics Form 450 pursuant to her Designation of Contracting Officer's Representative - Ms. Saucedo could not possibly have lacked candor when she disclosed her marriage and Mr. Saucedo's employment to the US government." (internal reference omitted). The contracting officer determined, on balance, in the Personal Conflict of Interest Memorandum that Ms. Saucedo's relationship did not rise to an actual or apparent conflict of interest that required further action. The court does not disturb the contracting officer's conflict of interest determination.

Protestor also argues that

the Navy's "interviewing" and fact-gathering processes were carried out in a perfunctory manner. Critically, the investigation did not include interviews with the two individuals at the center of the allegations (*i.e.*, the Saucedos). Instead, the Navy relied on a written email response that Ms. Saucedo had less than twenty-four hours to prepare, *see* Tab 36.c at AR 2750-54, and self-interested declarations from the Saucedos in which they denied acting in a criminal manner.

KOAM also contends that the "Navy unreasonably failed to conduct any document or email review in connection with its investigation, aside from 'a review of internal contractual documentation.'" KOAM argues that "[d]ocument and email review is a routine, and often initial, investigatory step, and it could have been used to test the Navy's conclusions that Ms. Saucedo did not participate in the procurement and did not communicate with Mr. Saucedo regarding the procurement or KOAM." (alteration added). Defendant argues that "the contracting officer's determination was reasonable that the oral interviews and written responses from *all* the SSEB members and the declarations under oath from Mr. and Ms. Saucedo was sufficient." (emphasis in original).

A contracting officer has discretion as to how he or she conducts a conflict of interest investigation, and that discretion is reviewed by this court for arbitrariness and capriciousness. The contracting officer in the above captioned bid protest concluded that

the email exchange between Ms. Saucedo with the contract specialist and the sworn declarations from both Mr. and Ms. Saucedo, as well as responses from all members of the Source Selection Evaluation Board was sufficient to reach a decision on the conflict of interest issues ,both actual and apparent. KOAM, however, argues Ms. Saucedo had less than 24 hours to respond to the lengthy number of questions posed by the contract specialist, which forced Ms. Saucedo to respond quickly. The court notes that the answers offered by Ms. Saucedo in the email exchange are very similar to the statements provided in her sworn declaration submitted under the penalty of perjury. Although protestor disagrees with the breadth of the investigation, unless the contracting officer's determinations were arbitrary and capricious, mere disagreement is not sufficient for the court to conclude the investigation was insufficient. See Appsential, LLC v. United States, 153 Fed. Cl. at 619. The Federal Circuit in Oracle America, Inc. v. United States explained:

> The standard for Claims Court review of a contracting officer's decision with regard to a conflict of interest is highly deferential. A contracting officer's conflict of interest determination will be upheld unless it is "arbitrary, capricious, or otherwise contrary to law." PAI Corp. v. United States, 614 F.3d 1347, 1352 (Fed. Cir. 2010). If the contracting officer's findings are rational, they will be upheld on judicial review. See Turner Constr. Co. v. United States, 645 F.3d 1377, 1383–87 (Fed. Cir. 2011).

Oracle Am., Inc. v. United States, 975 F.3d at 1296; see also Turner Constr. Co. v. United States, 645 F.3d at 1386 (citing PAI Corp. v. United States, 614 F.3d at 1352) ("The CO has considerable discretion in determining whether a conflict is significant."). The court concludes that the scope of the contracting officer's investigation was sufficient.

Protestor also argues that it "was unreasonable for the Navy to not consider, as reflected in KOAM's October 18, 2021 letter to the Navy, allegations that Ms. Saucedo has, on multiple occasions, defended McKean's performance under another contract during Navy meetings based on information she had learned from her husband, which reflects that Ms. and Mr. Saucedo exchange information regarding their work." As noted above, KOAM sent the Navy a letter which stated, in part:

> Following the dismissal of the protest as academic, KES learned that Ms. Saucedo has communicated with her husband in the past about ongoing Navy programs in which McKean was involved. Specifically, KES has been advised that, in multiple meetings in the past, NIEF government project leads have discussed problems and concerns regarding the Military Sealift Command ("MSC") program office, on which McKean and Mr. Saucedo provide contract support to PMW 160. When the NIEF MSC government project lead expressed frustration with the MSC program and its effects on the NIEF during weekly meetings of government project leads, Ms. Saucedo has spoken up to defend the MSC program based on information she has learned from her husband. In other words, Ms. Saucedo clearly has information about McKean and her husband's work on the MSC program that is unrelated to her role at the NIEF, and she has shared that information

with NIEF officials in the past in a way that has been helpful to McKean. Although this may not, in and of itself, constitute improper behavior, it does demonstrate that Mr. and Ms. Saucedo discuss details of their work for the Navy and share certain program-related information. Thus, it supports the concern about an appearance of impropriety, so we felt compelled to relay the information to you.

The contracting officer, however, specifically addressed KOAM's letter in the February 24, 2022 Personal Conflict of Interest Memorandum. The contracting officer wrote:

I did not uncover any further information related to KES counsel's 18 October 2021 email stating the KES learned that Ms. Saucedo spoke up to defend the MSC program, and thereby McKean. The information provided was vague, and offered no information as to any dates or timeframes it was alleged to have occurred. Ms. Saucedo stated in her declaration that she did not recall attending a government or government/contractor meeting wherein she discussed Military Sealift Command NIEF related efforts. Given the declarations by both Ms. Saucedo and Mr. Saucedo regarding Ms. Saucedo not revealing any proprietary information regarding KES to Mr. Saucedo, other information detailed above, and KES' admission that its allegation would not constitute improper behavior, I do not find this allegation affects my findings. Furthermore, the allegation is more about Mr. Saucedo discussing his work with Ms. Saucedo (not the reverse) which is not improper. Finally, the discussion of problems or concerns with regards to the MSC program office would not provide new or competitively useful information that would have given McKean an advantage over KES, who has overseen the full scope of work for the NIEF Engineering contract under its incumbent contracts.

Based on the facts of the present bid protest, and the deference given to a contracting officer to conduct a conflict of interest investigation, the court finds it was sufficient and reasonable for the contracting officer to conclude the investigation as he did. As articulated by the contracting officer, Ms. Saucedo declared, under penalty of perjury, that she did not recall attending any meetings discussing the Military Sealift Command NIEF related efforts and both Mr. Saucedo and Ms. Saucedo declared that Ms. Saucedo did not provide any proprietary information to Mr. Saucedo. Therefore, it was reasonable for the contracting officer not to inquire further about unsupported and unspecified allegations of impropriety raised by protestor.

Protestor also argues:

**Finally**, there is no evidence that the Contracting Officer consulted with the designated agency ethics official regarding the alleged conflict. This was a significant oversight, as designated agency ethics officials are subject-matter experts responsible for, among other things, "[p]roviding advice and counseling to prospective and current employees regarding government

ethics laws and regulations" and "[t]aking appropriate action to resolve conflicts of interest and the appearance of conflicts of interest."

(emphasis and alterations in original). Intervenor responds: "Again, KOAM does not cite any regulatory or statutory requirement for this measure, nor is it required by the FAR. KOAM merely disagrees with the Navy's chosen investigation techniques and attempts to override the Agency's discretion in determining the proper methodologies for the COI investigation." Defendant argues "KOAM offers no authority, nor are we aware of any, when a contracting officer must consult ethic officials on the basis of an *apparent* conflict of interest." (emphasis in original; internal cites omitted). The court agrees that the decision not to consult a designated agency ethics official does not render the contracting officer decision arbitrary or capricious. Given the highly deferential standard this court applies to the contracting officer's conflict of interest determination, the investigation the contracting officer undertook, and the documentation in the Personal Conflict of Interest Memorandum, the court finds the decision not to include the ethics official not dispositive or irrational given the facts of the bid protest currently before the court. See Turner Constr. Co. v. United States, 645 F.3d at 1383–87. In Harkcon, Inc. v. United States, 133 Fed. Cl. 441 (2017), a Judge of the United States Court of Federal Claims determined "the contracting officer's finding that there was no appearance of impropriety—and no actual impropriety, including no OCI or PIA violation—was neither irrational nor contrary to law." Id. at 466. The Judge in Harkcon also noted: "Under the '"highly deferential" rational basis view' that applies in bid protests, CHE Consulting, Inc. v. United States, 552 F.3d 1351, 1354 (Fed. Cir. 2008) (quoting Advanced Data, 216 F.3d at 1058), overturning a contracting officer's determination that there was no appearance of impropriety should be done sparingly." Harkcon, Inc. v. United States, 133 Fed. Cl. at 466. Based on the above discussion, this court does not find the contracting officer's decision that there was no actual conflict or the appearance of a conflict of interest to have been arbitrary or capricious when he allowed the procurement process to proceed.

Even if the court were to determine that the contracting officer improperly concluded that the relationship between Ms. Saucedo and Mr. Saucedo did not create the appearance of a conflict, which the court pointedly has not, under the holding of Oracle America, Inc. v. United States, 975 F.3d 1279, the court would still have to find that the conflict of intertest tainted the procurement or had a significant impact on the procurement at issue in the protest currently before this court in order to find in favor of protestor. Defendant also argued that the facts of this protest do not meet "the Oracle test where a conflict of interest must actually 'taint' or 'significantly impact the procurement.'"

In Oracle, the Federal Circuit explained:

The procurement at issue in this case, known as the Joint Enterprise Defense Infrastructure ("JEDI") Cloud procurement, is directed to the long-term provision of enterprise-wide cloud computing services to the Department of Defense. The JEDI Cloud solicitation contemplated a ten-year indefinite delivery, indefinite quantity contract. The Defense Department decided to award the contract to a single provider rather than making awards to multiple providers. The JEDI Cloud solicitation included

several "gate" provisions that prospective bidders would be required to satisfy.

Id. at 1283. Separate from issues related to the gate provisions, the Federal Circuit stated that

the Claims Court examined Oracle's claims that several Department officials who were involved in some way with the procurement had conflicts of interest, and that Amazon Web Services, Inc., ("AWS"), one of the bidders on the contract, had an organizational conflict, all of which infected the procurement. The court addressed the question whether the contracting officer had properly assessed the impact of the conflicts on the procurement and found that she had. The court then concluded that the contracting officer had properly exercised her discretion in finding that the individual and organizational conflicts complained of by Oracle did not affect the integrity of the procurement.

Id. at 1288. Specifically related to the conflicts of interest, the Federal Circuit further indicated that

[w]hen the claimed conflicts surfaced, the contracting officer conducted a detailed investigation and made findings as to the conflicts and their effects on the procurement. She determined that although there were conflicts of interest on the part of two of the employees, those conflicts and the asserted conflict on the part of the third employee did not have any effect on the procurement.

Id. at 1295 (alteration added). According to the Federal Circuit, after the trial court reviewed the contracting officer's findings, the Judge of the United States Court of Federal Claims "concluded that the contracting officer's investigation was thorough and her 'no effect' determination was reasonable." See id. To begin its analysis, the Federal Circuit specifically noted it would "reject Oracle's argument that the conflicts of interest in this case invalidate the solicitation regardless of whether they had any effect on the procurement," and stated:

The three former Defense Department employees whose conduct is at issue are Deap Ubhi, Anthony DeMartino, and Victor Gavin. Oracle challenges the Claims Court's conclusions as to the conflict of interest claims with respect to all three employees. Specifically, Oracle contends that the conflicted employees influenced the procurement by affecting the decision to use a single award and the selection of the gate criteria. While we share the views of the contracting officer and the Claims Court that some of the conduct at issue is troubling, at the end of the day we agree with the Claims Court that the conflict of interest problems of those three individuals had no effect on the JEDI Cloud solicitation.

Id. at 1296-97. The Federal Circuit fist addressed Deap Ubhi:

> Mr. Ubhi was employed by AWS until January 2016. After a period of time working for the Defense Department between August 2016 and November 2017, he returned to AWS. The contracting officer found that during Mr. Ubhi's tenure in the Department, he was involved in marketing research activities for the JEDI Cloud procurement and that he participated in drafting and editing some of the first documents shaping the procurement. In October 2017, Mr. Ubhi advised the Department that a company he had founded might be engaging in discussions with Amazon, the owners of AWS, and that he was recusing himself from further involvement in the JEDI Cloud procurement. The contracting officer subsequently concluded that Mr. Ubhi's involvement in the procurement did not materially impact the procurement, for several reasons: the restrictions on his involvement based on his prior employment had expired by the time he began working on the procurement; his participation in the procurement was limited; and he promptly recused himself when the potential conflict arose.

> It was later determined that the reason Mr. Ubhi gave for his recusal was false, and that instead he was negotiating for employment with AWS during the period before his recusal. When that fact came to light, the contracting officer reassessed the impact of Mr. Ubhi's actions in light of the new information. While the contracting officer found that Mr. Ubhi's behavior was troubling, she again determined that Mr. Ubhi's conflict of interest had not tainted the JEDI Cloud procurement. The Claims Court agreed with the contracting officer that Mr. Ubhi's behavior was troubling. The court agreed with the contracting officer that despite being aware of his ethical obligations, Mr. Ubhi ignored them and remained involved in the procurement when he should not have been.

> The situation with respect to Mr. Ubhi is more complex than is the case for the other alleged conflicts of interest. As the contracting officer recognized, his behavior was "disconcerting," as he was aware of his ethical obligations, but "ignored them." Oracle, 144 Fed. Cl. at 122. The contracting officer concluded that Mr. Ubhi had violated FAR 3.101-1 and possibly other statutory and regulatory provisions governing conflicts of interest, including 18 U.S.C. § 208. Nonetheless, the contracting officer and the Claims Court noted that when Mr. Ubhi returned to AWS, he did not work on the JEDI Cloud proposal team or in AWS's Federal Business Sector or its DoD Programs section. Moreover, the contracting officer found no evidence that Mr. Ubhi had shared any information with the team at AWS that was working on the JEDI Cloud procurement. The court found that the contracting officer's investigation in that regard was thorough and that there was no reason to disturb it. The contracting officer also found that even if Mr. Ubhi had disclosed nonpublic information to AWS, none of it would have been competitively useful. And she found that his seven-week period of work on the preliminary planning stage of the JEDI Cloud procurement did not

introduce bias in favor of AWS. The Claims Court found the contracting officer's conclusions on those issues to be supported by the record. The Claims Court, moreover, found that Mr. Ubhi's primary role was industry liaison; the record did not "warrant attributing to him any serious involvement in the technical or security aspects of the gate criteria." Oracle, 144 Fed. Cl. at 123.

Based on its review of the record, the Claims Court found that the contracting officer correctly concluded that although Mr. Ubhi should not have worked on the JEDI Cloud procurement, his involvement did not affect the procurement in any material way. With regard to the decision whether to use a single award or multiple awards, the Claims Court noted that the Defense Department's Cloud Executive Steering Group (of which Mr. Ubhi was not a member) expressed a preference for a single-award approach early on in the process, before Mr. Ubhi's involvement. Yet even after Mr. Ubhi left the Department, "the Deputy Secretary remained unconvinced regarding which approach to use," and the contracting officer recalled that as of April 2018, long after Mr. Ubhi was gone, "the single award decision was still being vigorously debated." Oracle, 144 Fed. Cl. at 123–24. Thus, the contracting officer concluded that Mr. Ubhi had no effect on the decision to use a single-award approach or the fashioning of the gate criteria. The Claims Court sustained that judgment.

Oracle Am., Inc. v. United States, 975 F.3d at 1297-98. On appeal, Oracle argued that the Ubhi no-impact determination "runs counter to the evidence before the agency." There is no force to this argument. Oracle's contention that Mr. Ubhi "deliberately, systematically, and successfully influenced individuals to adopt the single-award approach" far outruns the limited evidence Oracle cites to support it. First, Oracle cites two separate instant messages in which a Department attorney told Mr. Ubhi, "Single is assumed now," and added, "Really glad you were here this week." That is not evidence that Mr. Ubhi's support for a single-award approach was important to the decision. Moreover, as the contracting officer found, the evidence shows that the issue of single-versus multiple contract awards was debated long after Mr. Ubhi's departure from the agency, contrary to the implication in the instant message. Second, Oracle cites an instant message from Mr. Van Name in which he stated: "The single [vs.] multiple conversation is done. Everyone that matters is now convinced; Thursday's meeting was decidedly clear that we are all in favor of a single award." That message, however, does not remotely suggest that Mr. Ubhi's preference for a single-award approach was important to, or otherwise materially affected, the decisionmakers' selection. Oracle next argues that the contracting officer was wrong to state that there was no evidence that Mr. Ubhi's participation "had any substantive impact on the procurement decisions or documents," because there was evidence that Mr. Ubhi "edited material in October 2017" that the

Department ultimately included in the solicitation. But the contracting officer reviewed Mr. Ubhi's "edits" in detail, and concluded that Mr. Ubhi's "influence and direct edits to the documents were minimal." The contracting officer estimated that Mr. Ubhi contributed an estimated 100 changes to the Problem Statement, "ranging in significance from formatting and grammar to revision of sentences and paragraphs," which were made as part of a group effort. In addition, the contracting officer noted, Mr. Ubhi's participation "contributed a total of eight (8) edits to the [request for information], all of which were contained within two sentences." Contrary to Oracle's contention, the evidence amply supports the contracting officer's conclusion that Mr. Ubhi did not materially impact the solicitation, particularly with respect to the single-award approach and the gating requirements.

On a separate issue, Oracle briefly contends that the contracting officer was wrong to find that there was "no evidence that ... [Mr.] Ubhi obtained or disclosed any competitively useful nonpublic information." In fact, Oracle argues, Mr. Ubhi had access to sensitive information, including the JEDI Cloud team's Google drive, which he had on his computer. The contracting officer, however, found that Mr. Ubhi did not share any competitively useful nonpublic information with AWS and was not in a position to do so. The contracting officer noted that when Mr. Ubhi was rehired by AWS, he did not join AWS's JEDI Cloud proposal team, but joined the commercial team that was not involved in government contracts. Moreover, Mr. Ubhi was subject to firewalls within AWS, and the contracting officer reviewed numerous affidavits from AWS employees stating that he had not disclosed nonpublic information and that he was excluded from any involvement with AWS's JEDI Cloud proposal. In light of the deferential standard of review for contracting officers' findings regarding conflicts of interest, the finding that Mr. Ubhi did not share sensitive information with AWS must be sustained.

Oracle Am., Inc. v. United States, 975 F.3d at 1300-1301 (alterations in original). Regarding the second individual,

Mr. DeMartino was a consultant for AWS before joining the Defense Department and therefore was prohibited by applicable ethics rules from participating in matters involving AWS throughout his tenure at the Department. At the Department he occupied two positions at different times: Deputy Chief of Staff for the Secretary of Defense and Chief of Staff for the Deputy Secretary. In the course of his duties, Mr. DeMartino had limited involvement in the JEDI Cloud procurement. The contracting officer characterized Mr. DeMartino's involvement in the procurement as "ministerial and perfunctory" and noted that he "provided no input into the JEDI Cloud acquisition documents." The contracting officer noted that the Department's Standards of Conduct Office had determined that "Mr.

DeMartino's involvement in ministerial/administrative actions (such as scheduling meetings, editing/drafting public relations,[ ] etc.) did not constitute participating in the JEDI Cloud acquisition itself," and that Mr. DeMartino therefore was not in violation of the applicable ethical standards. However, in light of the high visibility of the procurement and in an abundance of caution Mr. DeMartino was advised that he should consider recusing himself from even ministerial and administrative matters related to the JEDI Cloud procurement, and he did so. In light of Mr. DeMartino's limited role, the contracting officer concluded that his activities "did not negatively impact the integrity" of the procurement.

The Claims Court upheld that determination, finding that none of the facts in the case contradicted the contracting officer's determination that Mr. DeMartino's involvement with the JEDI Cloud project had no substantive impact on the procurement. According to the court, the contracting officer rationally determined that Mr. DeMartino "was merely a go-between for the Deputy Secretary and did not have substantive input into the structure or content of the solicitation." Oracle, 144 Fed. Cl. at 121. The court found that Mr. DeMartino "did not have a voice in whether DoD should use a single or multiple award approach and did not craft the substance of the evaluation factors." Id.

Oracle contends that the contracting officer failed to consider an important aspect of the problem and that her conclusions were contrary to the evidence. Oracle points to various communications among Department officials, including Mr. DeMartino, and a draft public statement relating to the JEDI Cloud procurement that Mr. DeMartino participated in editing. The evidence cited by Oracle does not establish that Mr. DeMartino was significantly involved in crafting the substance of the procurement. We conclude that the record supports the contracting officer's finding, upheld by the Claims Court, that Mr. DeMartino's role in the procurement was limited, largely nonsubstantive, and did not significantly impact the procurement.

Oracle Am., Inc. v. United States, 975 F.3d at 1301-1302 (alterations in original; footnote omitted).

Finally, for the third individual challenged by Oracle:

During the procurement, Mr. Gavin was a Deputy Assistant Secretary of the Navy. Between August 2017 and January 2018, he discussed retirement plans with an AWS recruiter. In October 2017, he attended a meeting of the Cloud Executive Steering Group, which was planning the JEDI Cloud procurement, to share the Navy's experience with cloud services. In January 2018, he submitted a Request for Disqualification from Duties, asking that he be excluded from matters affecting the financial interests of

AWS. Later that month, he interviewed with AWS, and on March 29, 2018, he was offered a position with AWS, which he later accepted. On April 5, 2018, Mr. Gavin attended a meeting at which the attendees discussed the Draft Acquisition Strategy for the JEDI Cloud procurement. The contracting officer attended the same meeting and recalled that Mr. Gavin did not advocate for any particular vendor but instead advocated for a multiple-award approach.

After beginning his employment with AWS, Mr. Gavin was instructed by AWS that he was subject to an information firewall that prohibited him from disclosing any nonpublic information about the JEDI Cloud procurement to anyone at AWS. He agreed to comply with the firewall requirement. Following her investigation of the conflicts of interest involving the JEDI Cloud procurement, the contracting officer concluded that Mr. Gavin had violated FAR 3.101 and possibly 18 U.S.C. § 208. But the contracting officer found that Mr. Gavin's involvement in the JEDI Cloud project did not taint the procurement. In particular, the contracting officer found that Mr. Gavin had limited access to the Draft Acquisition Strategy, did not furnish any input to that document, did not introduce bias into any of the meetings that he attended, and did not disclose any competitively useful information to AWS. Although Mr. Gavin spoke with one member of the AWS JEDI Cloud proposal team before the firewall was instituted, that member and Mr. Gavin represented that Mr. Gavin had not disclosed any nonpublic information about the JEDI Cloud procurement.

The Claims Court found that the contracting officer's conclusions regarding Mr. Gavin were "well-supported." Oracle, 144 Fed. Cl. at 121. In particular, the court concluded that the record supported the contracting officer's findings that Mr. Gavin was involved in the procurement "only to offer his knowledge of the Navy's cloud services experience," and was not a member of any team that was working on the JEDI Cloud procurement. Id. at 121–22. The court noted that Mr. Gavin did not "assist in crafting the single award determinations or the technical substance of the evaluation factors." Id. at 122. At most, the court concluded, Mr. Gavin "attended a few JEDI Cloud meetings." Id. Moreover, the court added, Mr. Gavin did not appear to have obtained any contractor bid or proposal information, nor did he appear to have introduced any bias toward AWS in the meetings he attended. Id.

The court agreed with the contracting officer that Mr. Gavin had acted improperly in having a conversation with an AWS employee about the JEDI Cloud procurement after Mr. Gavin began working for AWS. The court found, however, that the contracting officer had "reasonably determined that Mr. Gavin simply did not have access to competitively useful information to convey to AWS." Id. at 122. Oracle argues that the Claims Court's statement that Mr. Gavin did not have access to competitively useful information to convey to AWS is contrary to the contracting officer's findings that Mr. Gavin

had access to the draft Acquisition Strategy in April 2018. That draft Acquisition Strategy, according to the contracting officer, contained nonpublic information that could be competitively useful. The Claims Court observed, however, that by the time Mr. Gavin began working at AWS, the draft request for proposals had been released. The draft request for proposals, the court explained, provided AWS "access to the relevant information that also appeared in the draft Acquisition Strategy." Id. The court's observation that the information in the draft Acquisition Strategy had become public by the time Mr. Gavin began working for AWS thus provided support for the contracting officer's finding that Mr. Gavin did not disclose any competitively useful nonpublic information to AWS; it did not reflect a conflict between the findings of the contracting officer and the decision of the Claims Court.

Oracle Am., Inc. v. United States, 975 F.3d at 1302-1303.

Regarding Oracle, defendant in the above captioned bid protest argues:

Analysis of the involvement of two other employees also revealed insignificant involvement, such that it did not "taint the procurement" or "significantly impact the procurement." But even though the one employee violated FAR 3.101-1, and possibly other statutes, the Court determined that this individual "did not furnish any input to the Draft Acquisition Strategy [document], did not furnish any input to that document, did not introduce any bias into any of the meetings that he attended, and did not disclose any competitively useful information to AWS." Thus, there was no conflict of interest.

(alteration in original; citations omitted). In response, KOAM contends that

whether an agency violated FAR 3.101-1 based on a failure to strictly avoid an appearance of a conflict of interest was not at issue in Oracle. Rather, the conflict-of-interest issues in Oracle fall into two categories: (1) alleged violations of the criminal conflict-of-interest statute, 18 U.S.C. § 208; and (2) the impact of alleged violations of the Procurement Integrity Act, 41 U.S.C. §§ 2101–2107, on the procurement pursuant to FAR 3.104-7.

Protestor also argues that "[n]otably, the protestor's briefs filed before the Federal Circuit in Oracle did not argue that the procurement should be invalidated because the agency failed to avoid an appearance of a conflict of interest pursuant to FAR 3.101-1." (alteration added). Therefore, KOAM contends that "Oracle does not graft an 'impact the procurement' requirement onto the unambiguous language in FAR 3.101-1 that an agency must strictly avoid the appearance of a conflict of interest." Intervenor responds that

Even though <u>Oracle</u> involved an agency's analysis of whether action was needed in light of an appearance of impropriety under FAR 3.101-1 (which KOAM's complaint alleges, ECF 22 at ¶4) KOAM insists that <u>Oracle</u> is irrelevant because the protester there did not specifically allege a violation of FAR 3.101-1 and instead relied on the Procurement Integrity Act. ECF 33, at 11-13. KOAM also offers a detailed discussion of portions of the <u>Oracle</u> decision that neither McKean nor the United States mention, and which are wholly irrelevant to this case. Neither argument changes the Federal Circuit's holding.

Similarly, defendant counters, referring to the <u>Oracle</u> decision:

As an overarching matter, KOAM incorrectly argues that <u>Oracle</u> is inapplicable because it allegedly did not involve a violation of FAR 3.101-1, because only the criminal COI statute, 18 U.S.C. § 208, and the Procurement Integrity Act, 41 U.S.C. §§ 2101-2107, were at issue in <u>Oracle</u>. KOAM Reply at 11-13. KOAM ignores that the contracting officer's investigation *also* specifically found violations of FAR 3.101-1, which this Court sustained.

(emphasis in original). The court notes that the Judge of the United States Court of Federal Claims in <u>Oracle</u> concluded regarding Mr. Gavin:

The CO decided that Mr. Gavin violated FAR 3.101-1, and possibly 18 U.S.C. § 208 (2012), but that his involvement did not taint the procurement. The CO specifically found that he had limited access to the draft Acquisition Strategy and did not furnish any input on the document; he did not disclose any competitively useful nonpublic information; he did not obtain or disclose other bid information to AWS; and he did not introduce bias into the meetings he attended. Regarding AWS, she concluded that it had not received any competitively useful information or an unfair advantage through Mr. Gavin.

<u>Oracle Am., Inc. v. United States</u>, 144 Fed. Cl. 88, 109 (2019), <u>aff'd</u>, 975 F.3d 1279 (Fed. Cir. 2020), <u>cert. denied,</u> 142 S. Ct. 68 (2021). When evaluating the contracting officer's determination the Judge in <u>Oracle</u> determined:

The CO likewise considered all of the relevant facts regarding Mr. Gavin's involvement. First, her conclusion that "Mr. Gavin violated FAR 3.101-1, and possibly violated 18 U.S.C. § 208 and its implementing regulations," is well-supported. The CO properly went on to ask whether, in light of the conflict, Mr. Gavin impacted the procurement. The record supports her conclusion that Mr. Gavin was involved only to offer his knowledge of the Navy's cloud services experience. He was not a member of the Cloud Executive Steering Group, Defense Digital Service, the Chief Information Office, or any other team tasked with spearheading aspects of this procurement. As far as we can tell from the record, he did not assist in crafting the single award

determinations or the technical substance of the evaluation factors. At most, he attended a few JEDI Cloud meetings. He does not appear to have obtained any contractor bid or proposal information nor does he appear to have introduced any bias toward AWS into the meetings he attended. It would have been proper for the CO to discount Mr. Gavin's affidavit as she did Mr. Ubhi's, because she felt he had violated FAR 3.101-1. Even when his involvement is considered without his own assurances that he did not act improperly, the CO's review of the record was reasonable that Mr. Gavin was involved solely to offer his past experience with cloud computing contracts.

Oracle Am., Inc. v. United States, 144 Fed. Cl. at 121–22. Additionally, the Judge in Oracle wrote regarding Mr. Ubhi: "First, the CO reached the obvious conclusion that Mr. Ubhi violated the FAR 3.101-1 requirement that officials "avoid strictly any conflict of interest or even the appearance of a conflict of interest in Government contractor relationships" and thus the matter had to be referred to the DoD Inspector General." Oracle Am., Inc. v. United States, 144 Fed. Cl. at 122. This court, therefore, disagrees with protestor that FAR 3.101-1 was not addressed in Oracle. The Federal Circuit also referred to the contracting officer's investigation and consideration of FAR 3.101: "Following her investigation of the conflicts of interest involving the JEDI Cloud procurement, the contracting officer concluded that Mr. Gavin had violated FAR 3.101 and possibly 18 U.S.C. § 208. But the contracting officer found that Mr. Gavin's involvement in the JEDI Cloud project did not taint the procurement." Oracle Am., Inc. v. United States, 975 F.3d at 1303.

Although review of agency's conflicts of interest investigations "are fact-specific inquiries," Axiom Res. Mgmt., Inc. v. United States, 564 F.3d at 1381-82, the language used by the United States Court of Appeals for the Federal Circuit in the Oracle decision regarding conflicts of interest was broad and not limited to a criminal conflict of interest statute or the Procurement Integrity Act. As noted above, the Federal Circuit declared it would "reject Oracle's argument that the conflicts of interest in this case invalidate the solicitation regardless of whether they had any effect on the procurement." Oracle Am., Inc. v. United States, 975 F.3d at 1296. As argued by defendant:

> Broadly speaking, KOAM's interpretation of Oracle's holding is also puzzling. KOAM seems to agree, as it must, that criminal COIs and violations of the Procurement Integrity Act must "significantly impact" or "taint" a procurement before a procurement decision is set aside. KOAM Reply at 11-13. But pursuant to FAR 3.101-1, where the "general rule is to avoid strictly any [COI] or even the appearance of a [COI] in Government-contractor relationships," KOAM argues that "an offeror may be disqualified based on an appearance of a personal COI, *even if there was no improper exchange of information*." Id. (emphasis added).

(emphasis and alterations in original). This court agrees with defendant and intervenor that KOAM's argument is not grounded in the Federal Circuit's decision. Both defendant and intervenor argue convincingly that and if a conflict of interest exists under FAR 3.101,

to succeed, a protestor would need to demonstrate the FAR 3.101 conflict "tainted the procurement." See Oracle Am., Inc. v. United States, 975 F.3d at 1303. Therefore, the court cannot subscribe to KOAM's interpretation of the Oracle decision.

Even if the contracting officer in the above captioned bid protest had found an apparent conflict of interest, the Oracle decision argues against a finding in favor of protestor. As described in the February 24, 2022 Personal Conflict of Interest Memorandum, the contracting officer determined that "[t]here is no evidence that Ms. Saucedo participated personally and substantially in the Procurement." (alteration added). The contracting officer also indicated:

> The PCI investigation confirmed from multiple sources including the written interviews of [redacted] (NIEF Branch Head and SSEB Chair), [redacted] (NIEF IPT Lead/Program Manager and initial SSEB Chair), the other SSEB members, and Ms. Saucedo (one of several CORs on KES' NIEF contract, N66001-18-D-0075) that Ms. Saucedo did not participate personally or substantially, or really in any capacity, with the follow-on NIEF Engineering source selection, including with the development of the statement of work, drafting of the source selection strategy, drafting the RFP, participating in the evaluation of proposals or selecting the awardee resulting in the NIEF Contract awarded to McKean.

(capitalization in original; internal reference omitted). The contracting officer's Personal Conflict of Interest Memorandum revealed that "[a]ll members of the SSEB (Mr. [redacted], Mr. [redacted], Mr. [redacted], and Ms. [redacted], and Mr. [redacted]) confirmed that Ms. Saucedo had no role in the evaluation of the proposals," and the contracting officer added, "[a]s Contracting Officer for this procurement, to my knowledge and from my review of the contract file, Ms. Saucedo had no role in any part of this procurement." (alteration added). Therefore, the contracting officer wrote:

> The PCI investigation revealed the absence of any PCI concern prior to award, since Ms. Saucedo was completely excluded from the acquisition planning and throughout the source selection process for the follow-on NIEF contract. The concern of impropriety was not a pre-award concern, since Ms. Saucedo did not have any role in the source selection process for the follow-on NIEF and the evaluation of proposals. Furthermore, the SSEB members were not given access to the cost proposals, and therefore, would not have known that Mr. Saucedo was listed as a proposed employee for McKean. The SSEB did not have any available information in the non-cost proposal documents provided for their review to know that Mr. Saucedo was either proposed or if he had any involvement with McKean's proposal. When McKean received the follow-on NIEF contract award Ms. Saucedo had a discussion with her supervisor that her role would need to change in order to avoid any PCI that could arise in administration of the follow-on contract, which her husband would be employed under.

Further, in the February 24, 2022 Business Clearance Memorandum, the Source Selection Authority noted that there was "[n]o PCI Found During Investigation," and elaborated

> the Contracting Officer found no evidence that: (1) Ms. Saucedo participated personally and substantially in any capacity in the NIEF Engineering source selection, including development of the statement of work, drafting of the source selection strategy and request for proposal, or participated in the evaluation of proposals resulting in the NIEF Contract awarded to McKean; and (2) Ms. Saucedo disclosed any competitively useful nonpublic information, and what information she did possess would not have provided a competitive advantage due to the nature of the evaluation factors including cost.

(alteration added; internal reference omitted).

In sum, even if the contracting officer had determined that there was an apparent conflict of interest as a result of the relationship between Mr. Saucedo and Ms. Saucedo, given the facts of the protest currently before the court, the contracting officer's Personal Conflict of Interest Memorandum demonstrates that the relationship did not taint or meaningfully impact the procurement as "Ms. Saucedo did not participate personally or substantially, or really in any capacity, with the follow-on NIEF Engineering source selection, including with the development of the statement of work, drafting of the source selection strategy, drafting the RFP, participating in the evaluation of proposals or selecting the awardee resulting in the NIEF Contract awarded to McKean." KOAM does not succeed on its apparent conflict of interest claim under the Oracle framework or otherwise. Many of protestor's allegations were speculative based on what could have happened, not what did happen. For example, as discussed above, KOAM conjectured that "[g]iven that the Saucedos were working full-time in their shared home throughout the procurement, Ms. Saucedo could have easily shared the information with Mr. Saucedo." (internal reference omitted; alteration added). Protestor also claimed "McKean could have used KOAM's direct labor rates to develop the exact staffing approach that McKean used to win the contract – *i.e.*, a solution that would underbid KOAM by cherry-picking McKean employees from around the country with labor rates that were lower than KOAM's employees." The court finds that the agency's determination that there was not an actual or apparent conflict of interest and the procurement was not tainted by a conflict was not arbitrary and capricious, and was sufficient to not disqualify McKean from competing under the RFP. See Oracle Am., Inc. v. United States, 975 F.3d at 1296 (citing PAI Corp. v. United States, 614 F.3d at 1352).

Cost Realism

In addition to arguing that there was an the apparent conflict of interest, KOAM argues "[t]he Navy failed to adjust McKean's 'Combined Technical/Risk Rating' based on the risk of McKean's unrealistic staffing approach," and "[t]he Navy's decision to not adjust McKean's "combined technical/risk rating" based on the risk of its unrealistic staffing

69

approach was arbitrary, capricious, and contrary to law." (alterations added). Defendant responds that the "Agency's Cost Realism analysis was reasonable and in accordance with the Solicitation."

The Federal Circuit in DynCorp succinctly explained: "'Cost realism' asks if a cost estimate is too low; 'price reasonableness' asks if a proposed price is too high." DynCorp Int'l, LLC v. United States, 10 F.4th 1300, 1305 (Fed. Cir. 2021). The Federal Circuit in Agile Defense, Inc. v. United States explained, regarding cost realism:

> The regular view of the Court of Federal Claims, which we approve, is that contracting agencies enjoy wide latitude in conducting the cost realism analysis. See, e.g., Mission1st Grp., Inc. v. United States, 144 Fed. Cl. 200, 211 (2019) ("It is well established that contracting agencies have broad discretion regarding the nature and extent of a cost realism analysis, unless the agency commits itself to a particular methodology in a solicitation." (citation and internal quotation marks omitted)); Dellew Corp. v. United States, 128 Fed. Cl. 187, 194 (2016) ("The Agency has demonstrated that it considered the information available and did not make irrational assumptions or critical miscalculations. To require more would be infringing on the Agency's discretion in analyzing proposals for cost realism." (citation and internal quotation marks omitted)); United Payors & United Providers Health Servs., Inc. v. United States, 55 Fed. Cl. 323, 329 (2003) (emphasizing that the procuring "agency is in the best position to make [the] cost realism determination" (citation and internal quotation marks omitted)).

Agile Def., Inc. v. United States, 959 F.3d 1379, 1385–86 (Fed. Cir. 2020). A Judge of the United States Court of Federal Claims described:

> To successfully challenge a cost realism analysis, a protestor must demonstrate "the absence of a rational basis for the agency's decision." CSC Gov't Sols. LLC v. United States, 129 Fed. Cl. 416, 429 (2016) (internal citations omitted) (internal quotations omitted). When reviewing an agency's cost realism determination, "the Court defers to those agency conclusions that are rational and based on reasoned judgment." United Payors & United Providers Health Servs., Inc. v. United States, 55 Fed. Cl. 323, 329 (2003).

Perspecta Enter. Sols. LLC v. United States, 151 Fed. Cl. 772, 785 (2020).

The FAR also provides a framework for the cost realism. The FAR at FAR 15.404-1(d) states:

> (d) Cost realism analysis.

> (1) Cost realism analysis is the process of independently reviewing and evaluating specific elements of each offeror's proposed cost estimate to determine whether the estimated proposed cost elements are realistic for

the work to be performed; reflect a clear understanding of the requirements; and are consistent with the unique methods of performance and materials described in the offeror's technical proposal.

(2) Cost realism analyses shall be performed on cost-reimbursement contracts to determine the probable cost of performance for each offeror.
(i) The probable cost may differ from the proposed cost and should reflect the Government's best estimate of the cost of any contract that is most likely to result from the offeror's proposal. The probable cost shall be used for purposes of evaluation to determine the best value.
(ii) The probable cost is determined by adjusting each offeror's proposed cost, and fee when appropriate, to reflect any additions or reductions in cost elements to realistic levels based on the results of the cost realism analysis.

(3) Cost realism analyses may also be used on competitive fixed-price incentive contracts or, in exceptional cases, on other competitive fixed-price-type contracts when new requirements may not be fully understood by competing offerors, there are quality concerns, or past experience indicates that contractors' proposed costs have resulted in quality or service shortfalls. Results of the analysis may be used in performance risk assessments and responsibility determinations. However, proposals shall be evaluated using the criteria in the solicitation, and the offered prices shall not be adjusted as a result of the analysis.

FAR 15.404-1(d) (2021). FAR 15.404-1(c) also provides:

(c) Cost analysis.

(1) Cost analysis is the review and evaluation of any separate cost elements and profit or fee in an offeror's or contractor's proposal, as needed to determine a fair and reasonable price or to determine cost realism, and the application of judgment to determine how well the proposed costs represent what the cost of the contract should be, assuming reasonable economy and efficiency.

(2) The Government may use various cost analysis techniques and procedures to ensure a fair and reasonable price, given the circumstances of the acquisition. Such techniques and procedures include the following:
(i) Verification of cost data or pricing data and evaluation of cost elements, including—
(A) The necessity for, and reasonableness of, proposed costs, including allowances for contingencies;
(B) Projection of the offeror's cost trends, on the basis of current and historical cost or pricing data;
(C) Reasonableness of estimates generated by appropriately calibrated and validated parametric models or cost-estimating relationships; and

(D) The application of audited or negotiated indirect cost rates, labor rates, and cost of money or other factors.

FAR 15.404-1(c). FAR 15.305 provides:

(a) Proposal evaluation is an assessment of the proposal and the offeror's ability to perform the prospective contract successfully. An agency shall evaluate competitive proposals and then assess their relative qualities solely on the factors and subfactors specified in the solicitation. Evaluations may be conducted using any rating method or combination of methods, including color or adjectival ratings, numerical weights, and ordinal rankings. The relative strengths, deficiencies, significant weaknesses, and risks supporting proposal evaluation shall be documented in the contract file.

(1) Cost or price evaluation. Normally, competition establishes price reasonableness. Therefore, when contracting on a firm-fixed-price or fixed-price with economic price adjustment basis, comparison of the proposed prices will usually satisfy the requirement to perform a price analysis, and a cost analysis need not be performed. In limited situations, a cost analysis may be appropriate to establish reasonableness of the otherwise successful offeror's price (see 15.403-1(c)(1)(i)(C)). When contracting on a cost-reimbursement basis, evaluations shall include a cost realism analysis to determine what the Government should realistically expect to pay for the proposed effort, the offeror's understanding of the work, and the offeror's ability to perform the contract. Cost realism analyses may also be used on fixed-price incentive contracts or, in exceptional cases, on other competitive fixed-price-type contracts (see 15.404–1(d)(3)). (See 37.115 for uncompensated overtime evaluation.) The contracting officer shall document the cost or price evaluation.

FAR 15.305(a) (2021).

The RFP at issue in the above captioned protest contemplated an IDIQ single award contract with cost-plus-fixed-fee pricing arrangement over a potential five year performance period, with one base year and four one-year option periods. The RFP provided that

The Contractor shall perform work at the contractor's facilities and/or onsite at government facilities and on travel in support of designated activities. Because the NIWC Pacific Code 42150 leadership resides in San Diego, the majority of the production and PITCO/GAT support will be required to be supported within the NIWC Pacific (4301 Pacific Highway, San Diego, CA) Area of Responsibility (10 Miles). The majority of engineering support is expected to be off site at the contractor facility.

During the evaluation process, the Navy requested McKean to clarify its proposal and asked:

In order to complete our cost realism analysis additional clarification is required. The subject RFP states some of the work is required to be performed in the San Diego, CA area. In order to complete our cost realism analysis using the actual rates submitted in your cost proposal, we need you to clarify for each of the named individuals, where the work was performed for the rates submitted.

As indicted above, McKean subsequently provided the requested information. In the Source Selection Authority's February 24, 2022 Business Clearance Memorandum, the Source Selection Authority noted with regards to McKean's cost proposal:

McKean combined with their subcontractors proposed all hours and overtime hours in accordance with the RFP. McKean proposed prime hours on 69% of the overall level of effort in terms of hours. McKean proposed on a CPFF [Cost Price Fixed Fee] basis. According to DCAA Audit Report No. 6151-2015T17741001 dated 6 February 2015, McKean's accounting system was found adequate. Therefore, McKean's accounting system is considered suitable for a cost reimbursement contract. Based on the analysis below, McKean's proposed costs were found to be 3.89% or $7,578,076.48 below the realistic cost; therefore, a cost realism adjustment was made and McKean's cost was realized up from $187,467,409.92 to $195,045,486.39.

(i). Prime Direct Labor.
McKean proposed direct labor rates for 28 labor categories with a list of rates for 128 employees. McKean's direct labor rates were developed by using the actual salaries for the proposed current McKean employees or the contingent salaries (three employees) for the proposed contingent McKean employees, in which signed Letters of Intent were provided. Although McKean's rates were substantiated with corresponding employee payroll information, clarifications revealed not all of the payroll information provided was for work within San Diego. Twenty of the 128 proposed rates were based on actual labor rates for named individuals whose labor rate were substantiated by payroll records and whose place of performance of work was San Diego, CA, were deemed realistic and reasonable and are shown in averages in the first table below. The rates for 108 of the 128 rates proposed by McKean were based on work performed outside of San Diego. 24 of the 108 non-San Diego based rates were found to be equal or above the average San Diego Rates identified in the San Diego Rates Utilized for Cost Realism Analysis Table on page 24 and no cost realism adjustment was made. However, 84 of the 108 non-San Diego based rates for individuals in the remaining 21 labor categories were lower than the San Diego Rates Utilized for Cost Realism Analysis Table on page 24. The direct labor rates for these 84 employees were realized up accordingly to the San Diego Rates identified in the San Diego Rates Utilized for Cost Realism

Analysis Table on page 24, as shown in the second table below. The tables below includes direct labor rates proposed per labor category for the base year, which were escalated by [redacted]% year over year for the option years. Proposed overtime hours for exempt and non-exempt employees were reviewed and found to be realistic. Overtime rates for non-exempt employees working as Junior Configuration Management Specialist, Senior Material Specialist, Material Specialist, Technical Typist, Warehouse/Forklift Operator, and Assembler Electronic/Electrical were proposed [redacted]. Overtime rates for the remaining labor categories proposed were for exempt individuals that were proposed [redacted]. Based on the rationale above, McKean's direct labor rates were realized up accordingly.

(alteration added). Regarding KOAM's cost proposal, in the February 24, 2022 Business Clearance Memorandum, the Source Selection Authority noted:

KES combined with their subcontractors proposed all hours and overtime hours in accordance with the RFP. KES proposed prime hours on 84.5% of the overall level of effort in terms of hours. KES proposed on a CPFF basis. The DCMA administrative contracting officer (ACO) sent a final determination letter, which formally approved KES' accounting system based on a post award review of KES accounting system documented in DCAA Audit Report No. 4151-2020C17741003 on 12 August 2020. Therefore, the KES's accounting system is considered suitable for a cost reimbursement contract. Based on the analysis below KES's proposed costs were found to be realistic; therefore, no cost realism adjustment was made.

(i). Prime Direct Labor.
KES proposed direct labor rates for 30 labor categories with a list of rates for 160 employees. KES' direct labor rates were developed for most labor categories and hours using named individuals currently supporting the existing NIEF requirement. All of KES rates for named individuals were substantiated with corresponding employee payroll information for work performed in San Diego.

(alteration added). Regarding KOAM's cost proposal, in the February 24, 2022 Business Clearance Memorandum the Source Selection Authority noted:

KES combined with their subcontractors proposed all hours and overtime hours in accordance with the RFP. KES proposed prime hours on 84.5% of the overall level of effort in terms of hours. KES proposed on a CPFF basis. The DCMA administrative contracting officer (ACO) sent a final determination letter, which formally approved KES' accounting system based on a post award review of KES accounting system documented in DCAA Audit Report No. 4151-2020C17741003 on 12 August 2020.

Therefore, the KES's accounting system is considered suitable for a cost reimbursement contract. Based on the analysis below KES's proposed costs were found to be realistic; therefore, no cost realism adjustment was made.

(i). Prime Direct Labor.
KES proposed direct labor rates for 30 labor categories with a list of rates for 160 employees. KES' direct labor rates were developed for most labor categories and hours using named individuals currently supporting the existing NIEF requirement. All of KES rates for named individuals were substantiated with corresponding employee payroll information for work performed in San Diego.

Protestor argues

The Navy's decision to not adjust McKean's "combined technical/risk rating" based on the risk of its unrealistic staffing approach was arbitrary, capricious, and contrary to law for multiple reasons. **First**, the record indicates that the Navy did not even consider this issue prior to its original award decision to McKean. Specifically, there is no mention in the original Business Clearance Memorandum (or in any prior document) of the Navy considering whether McKean's technical evaluation should be adjusted based on its unrealistic staffing approach; rather, the Navy created its one-sentence explanation for the decision after KOAM's original GAO protest and during corrective action. Thus, the Navy's explanation not only postdates the Navy's original award to McKean, it also post-dates the initiation of the protest process. As such, there is questionable reason for deference to the Navy's decision.

(emphasis in original). The operative Business Clearance Memorandum before the court is the Source Selection Authority's February 24, 2022 Business Clearance Memorandum. The original Business Clearance Memorandum, dated August 23, 2021, before the first GAO protest, and the Navy's evaluations before the first GAO protest are not before this court. After KOAM protested the original decision to award the contract to McKean to the GAO, the Navy indicated to GAO in its September 27, 2021 correspondence: "After reviewing the subject protest, the Agency will undertake corrective action." The Navy noted that it would "make a new source selection decision, as appropriate." Once an agency takes corrective action, earlier claims about the agency's evaluation process are moot. See Savantage Fin. Servs., Inc. v. United States, 118 Fed. Cl. 487, 491 (2014). The Navy, thereafter, issued a new source selection decision in the Source Selection Authority's February 24, 2022 Business Clearance Memorandum. The court only considers the Navy's evaluations in the February 24, 2022 Business Clearance Memorandum.

Regarding protestor's claim that the Navy offered a "one-sentence explanation," KOAM argues "the Navy's reason for not reevaluating McKean's technical proposal fails

to articulate a 'a rational connection between the facts found and the choice made.'" (quoting CRAssociates,Inc. v. United States, 95 Fed. Cl. 357, 376 (2010)). Protestor argues: "There is a single, conclusory sentence in the record that explains this decision: '[T]he adjustment [made to McKean's labor rates] does not indicate a lack of understanding of the requirements or a concern regarding performance as based upon their performance in the non-costs factors they understand the work and have done similar work before and well.'" (alterations in original). Intervenor argues that the Navy "offered more than a sentence in support of its conclusion that McKean understood contract requirements and proposed in accordance with all hours/LOE [level of effort] requirements, and these conclusions were sufficient bases upon which the Agency could rely in declining to downgrade McKean's Technical Approach score." (alteration added).

As indicated above, in the Source Selection Authority's February 24, 2022 Business Clearance Memorandum, the Source Selection Authority noted with regards to McKean's cost proposal:

> McKean combined with their subcontractors proposed all hours and overtime hours in accordance with the RFP. McKean proposed prime hours on 69% of the overall level of effort in terms of hours. McKean proposed on a CPFF [Cost Price Fixed Fee] basis. According to DCAA Audit Report No. 6151-2015T17741001 dated 6 February 2015, McKean's accounting system was found adequate. Therefore, McKean's accounting system is considered suitable for a cost reimbursement contract. Based on the analysis below, McKean's proposed costs were found to be 3.89% or $7,578,076.48 below the realistic cost; therefore, a cost realism adjustment was made and McKean's cost was realized up from $187,467,409.92 to $195,045,486.39.

> (i). Prime Direct Labor.
> McKean proposed direct labor rates for 28 labor categories with a list of rates for 128 employees. McKean's direct labor rates were developed by using the actual salaries for the proposed current McKean employees or the contingent salaries (three employees) for the proposed contingent McKean employees, in which signed Letters of Intent were provided. Although McKean's rates were substantiated with corresponding employee payroll information, clarifications revealed not all of the payroll information provided was for work within San Diego. Twenty of the 128 proposed rates were based on actual labor rates for named individuals whose labor rate were substantiated by payroll records and whose place of performance of work was San Diego, CA, were deemed realistic and reasonable and are shown in averages in the first table below. The rates for 108 of the 128 rates proposed by McKean were based on work performed outside of San Diego. 24 of the 108 non-San Diego based rates were found to be equal or above the average San Diego Rates identified in the San Diego Rates Utilized for Cost Realism Analysis Table on page 24 and no cost realism adjustment was made. However, 84 of the 108 non-San Diego based rates for

individuals in the remaining 21 labor categories were lower than the San Diego Rates Utilized for Cost Realism Analysis Table on page 24. The direct labor rates for these 84 employees were realized up accordingly to the San Diego Rates identified in the San Diego Rates Utilized for Cost Realism Analysis Table on page 24, as shown in the second table below. The tables below includes direct labor rates proposed per labor category for the base year, which were escalated by [redacted]% year over year for the option years. Proposed overtime hours for exempt and non-exempt employees were reviewed and found to be realistic. Overtime rates for non-exempt employees working as Junior Configuration Management Specialist, Senior Material Specialist, Material Specialist, Technical Typist, Warehouse/Forklift Operator, and Assembler Electronic/Electrical were proposed [redacted]. Overtime rates for the remaining labor categories proposed were for exempt individuals that were proposed [redacted]. Based on the rationale above, McKean's direct labor rates were realized up accordingly.

(alteration added). The Source Selection Authority's February 24, 2022 Business Clearance Memorandum also included the following tables:

[redacted]

In addition, the Source Selection Authority considered McKean's overhead rates when it considered the cost realism analysis and noted:

McKean proposed four OH [overhead] rates, each associated with a different cost pool in accordance with their accounting system. The OH rates were compared with the 2021 PBRs [Provisional Billing Rates] that were approved by DCAA on 15 January 2021. Since McKean's proposed OH rates for Government Site and Contractor Site matched the approved PBRs for 2021, the proposed OH rates are considered reasonable, and no cost realism adjustment was made.

(alterations added). The Source Selection Authority's February 24, 2022 Business Clearance Memorandum included the following tables regarding overhead:

[redacted]

The Source Selection Authority further considered McKean's fringe rates when it considered the cost realism analysis and noted:

McKean's proposed fringe rates was compared with the 2021 PBRs that were approved by DCAA [Defense Contract Audit Agency] on 15 January 2021. Since McKean's proposed fringe rates for Government Site and Contractor Site matched the approved PBRs for 2021, the proposed fringe

rates are considered reasonable, and no cost realism adjustment was made.

(alteration added). The Source Selection Authority's February 24, 2022 Business Clearance Memorandum included the following tables regarding fringe rates:

[redacted]

(alterations added).

After review of the above, the Source Selection Authority, in the February 24, 2022 Business Clearance Memorandum, determined:

> In terms of cost, the risk of unrealistic cost was addressed by performing cost realism analysis of all cost information included within the proposals for all prime contractors and the respective subcontractors. The risk of accepting cost based on unbalanced pricing or underestimating the number of hours required to perform was mitigated by verifying that each of the prime contractors and all subcontractors proposed hours that added up to the total level of effort identified within the RFP per labor category and overall. The risk of accepting unrealistically low cost based on acceptance of rates generated from payroll information outside of the San Diego locality was mitigated via a two-part process, which consisted of: 1) identification of all non-San Diego based rates through review of each contractor's proposals or via clarification, and 2) application of an upward adjustment of non-San Diego rates to the average San Diego rate proposed by all offerors for each labor category. Using the risk mitigation tools referenced above, McKean's proposed cost were adjusted during the cost realism analysis. KES' proposed realistic direct and indirect cost that were compared to company payrolls, and indirect rate information provided by DCAA and DCMA, and were not adjusted during the cost realism analysis. McKean's probable cost of $195,045,486.39 was 4.80% or $9,824,558.83 lower than KES' probable cost of $204,870,045.22. Furthermore, the adjustment does not indicate a lack of understanding of the requirements or a concern regarding performance as based upon their performance in the non-costs factors they understand the work and have done similar work before and well.

Therefore, it was not a single sentence that lead the Source Selection Authority to determine that the adjustments to intervenor's costs did "not indicate a lack of understanding of the requirements or a concern regarding performance as based upon their performance in the non-costs factors they understand the work and have done similar work before and well."

For KOAM's claim that the "Navy's decision to not adjust McKean's 'combined technical/risk rating' based on the risk of its unrealistic staffing approach was arbitrary, capricious, and contrary to law," the court notes that for the Cost analysis, the RFP stated:

The Government will evaluate the estimated cost and proposed fee of each offer for realism and reasonableness in accordance with FAR Subpart 15.4 and as described below. The purpose of this evaluation will be (a) to verify the offeror's understanding of the requirements; (b) to assess the degree to which the cost/price proposal reflects the approaches and/or risk assessments made in the proposal as well as the risk that the offeror will provide the supplies or services for the offered prices/cost; and (c) assess the degree to which the cost reflected in the cost/price proposal accurately represents the work effort included in the proposal. Proposed costs may be adjusted, for purposes of evaluation, based upon the results of the cost realism evaluation. In a competitive environment, an offeror is incentivized to propose the lowest possible price; therefore, downward cost realist adjustments generally will not be made. When a cost realism analysis is performed, the resulting realistic cost estimate will be used in the evaluation. Cost realism analysis may be limited to those offerors whose proposals represent the most likely candidate(s) for award, based on the Government's technical evaluation and the offeror(s) proposed costs. In addition to easily identifiable cost adjustments, unrealistic cost proposals may result in a re-evaluation and concurrent rescoring of technical proposals. Such re-evaluation based on cost or realistic cost analysis could negatively impact the technical rating and ranking of the proposal. Depending on the number of offerors and the number and dollar amount of proposed subcontractors, the Government may choose to limit the extent of the cost realism analysis of offerors' proposed subcontractor costs. In such instance, the Government will establish a threshold whereby individual subcontractor cost proposals that do not meet the threshold will not undergo a cost realism analysis. The threshold established by the Government may consist of a percentage of the prime contractor's proposed costs, or a dollar amount, or a combination thereof. All offers with separately priced line items will be analyzed to determine if the prices are unbalanced. Offers may be rejected if the Contracting Officer determines the lack of balance poses an unacceptable risk to the Government.

The RFP stated that "unrealistic cost proposals may result in a re-evaluation and concurrent rescoring of technical proposals. Such re-evaluation based on cost or realistic cost analysis could negatively impact the technical rating and ranking of the proposal," and that "[d]epending on the number of offerors and the number and dollar amount of proposed subcontractors, the Government may choose to limit the extent of the cost realism analysis of offerors' proposed subcontractor costs," are discretionary decisions by the agency. (alteration added). As noted by defendant: "There was *no* requirement for the agency to adjust McKean's technical rating."

Protestor also argues: "**Second**, there is no evidence in the record that the Contracting Officer or the Contracting Specialist even communicated with the technical

evaluators about the cost realism evaluation or the potential risk of McKean's staffing approach." Protestor contends:

> The Source Selection Plan states that the Contracting Specialist will be the "sole evaluator" of cost and that technical evaluators will not have access to cost proposals; however, it further provides that, with approval of the Source Selection Authority, the Contract Specialist "may disclose selected cost information as required (*e.g.*, when technical analysis is necessary to make a realism or reasonableness determination)." (emphasis added). Thus, although the Source Selection Plan expressly contemplated that the Contract Specialist could communicate with the technical evaluators to obtain technical analysis that was necessary to the cost realism evaluation, there is no evidence that such a communication ever occurred.

(emphasis in original; internal reference omitted). Further, as discussed above, the RFP provided:

> The Contract Specialist will be the sole evaluator for Acceptability of the Offer, Small Business Participation, and Cost. The Contract Specialist will not evaluate any other factors. Input from the SSEB Chairperson and other SSEB members may be solicited. Except for the Contract Specialist, the SSEB will not have access to cost proposals; however, with approval of the SSA, the Contract Specialist may disclose selected cost information as required (e.g., when technical analysis is necessary to make a realism or reasonableness determination).

The court agrees with intervenor that "the Contract Specialist did not abuse their discretion in failing to seek the SSA's approval to transmit the cost realism evaluation results to the Technical Team," because the RFP gave the Contract Specialist discretion to determine if the Contract Specialist required help from the Source Selection Evaluation Board to evaluate Cost. As defendant explained, "[t]his reference to 'realism or reasonableness determination' is with respect to whether the contract specialist needed assistance from the SSEB members in order to calculate costs, and the contract specialist was *not* required to consult with the technical evaluators."[11] (emphasis in original; alteration added).

> Additionally, protestor argues that

> the Navy's explanation that McKean "understand[s] the work and [has] done similar work before and well" fails to accord with – or even consider – three material facts contained in the record. First, the Navy "recognized the risk" in McKean's cost proposal of proposing a workforce with more than half of

---

[11] In defendant's motion for judgement on the Administrative Record, defendant also suggests because "KOAM has abandoned its challenge to the agency's methodology of conducting the cost realism analysis of McKean's proposal, it appears this point is moot."

the individuals from outside the San Diego area. 49.b at AR 3219. This fact is material because the risk recognized in the cost proposal is equally relevant to the "combined technical/risk" rating assigned to McKean's technical proposal.

(alteration in original). Intervenor points out

As for the first "material fact" cited by KOAM, the Navy did not recognize risk in McKean's proposal for "a **workforce** with more than half of the individuals from outside the San Diego area." This is a blatant misrepresentation of the Agency's legal memorandum filed in the GAO protest (not an evaluation document). The Agency's counsel instead noted that "the Navy recognized the risk in McKean's cost proposal with regard to providing more than half of the **labor rates** from individuals from outside the San Diego area, and addressed that in the cost realism analysis."

(emphasis in original; internal reference omitted).

Protestor additionally argues that

three of the four questions addressed in the technical evaluation (Questions 2, 3, and 4) focused on work to be performed at the Navy's Network Integration Engineering Facility in San Diego Tab 22 at AR 1529-30, and the "risk of unsuccessful performance" was to be evaluated as "one aspect inherent in the evaluation" of an offeror's technical approach. Tab 7 at AR 161. This fact is material because the availability of McKean's broadly dispersed staff to support performance at the Network Integration Engineering Facility raised serious concerns about the company's "ability to perform the contract," which must be evaluated in a cost realism analysis pursuant to FAR 15.305(a)(1).

As indicated above, the four questions included with the Technical Approach Worksheet in the Source Selection Plan stated:

**1.) What tools and techniques will you employ to manage Cost, Schedule, and Performance of the multiple projects and associated C4ISR Task Orders that will be accomplished during the execution of this contract?**

**2.) What tools and techniques will you use to manage the inventory, tracking, and reporting of C4ISR materials that will be moving between the different functional areas and physical locations within the NIEF?**

**3.) Question: What tools and techniques will you use for management and completion of C4ISR engineering projects from Requirements to Delivery, for the development of Engineering Development Model**

**(EDM) / First Article System (FAS), and execution of Environmental Qualifications Testing (EQT)?**

**4.) Question: What tools and techniques will you use to properly execute Pre-Installation Check-out and Operational (PITCO) Testing and Government Acceptance Testing (GAT) as well as Factory Acceptance Testing (FAT) for C4ISR systems and components that are received or developed by the NIEF?**

(capitalization and emphasis in original). As correctly observed by the defendant, the questions "refer to *tools and techniques*, *not the location of the labor force*." (emphasis in original).

> Furthermore, KOAM argues that

> during clarifications, McKean clearly stated its understanding that performance locations were not specified in the Solicitation, when in fact the Solicitation contemplated that most of the work – and specific, significant elements of that work – would be performed in San Diego. This fact is material because it demonstrates that McKean lacked "an understanding" of the requirements and the work to be performed under the contract, which was one of the three cost realism elements to be evaluated pursuant to the Solicitation, FAR 15.305(a)(1), FAR 15.404-1(d), and 48 C.F.R. § 215.300.

Intervenor argues "McKean did not propose to have a majority of its workforce located outside of San Diego, but merely substantiated the majority of its proposed labor rates with actual rates of individuals *currently* located outside of San Diego." (emphasis in original). As noted above, RFP indicated:

> The Contractor shall perform work at the contractor's facilities and/or onsite at government facilities and on travel in support of designated activities. Because the NIWC Pacific Code 42150 leadership resides in San Diego, the majority of the production and PITCO/GAT support will be required to be supported within the NIWC Pacific (4301 Pacific Highway, San Diego, CA) Area of Responsibility (10 Miles). The majority of engineering support is expected to be off site at the contractor facility.

The court notes that the RFP is not precise on the specific location of the work to be performed under the contract. For example, the Section 3.6.5 of the RFP, "Environmental Qualification Testing (EQT) Lab Support" states:

> As directed by individual TO [Task Order], the Contractor shall assist in operating and maintaining requirements associated with NIWC Pacific Code 42150 Environmental Qualification Testing (EQT) services. Assistance will include development of EQT procedures, conducting EQT, providing test results, and providing technical support services as required

per individual task order. The Contractor will primarily conduct required work within the immediate San Diego geographical area; however, as detailed per individual task order, other locations outside of the San Diego area may be required.

(alteration added). Even if McKean did not understand the location, which, as noted above, intervenor strenuously disagrees, the Navy adjusted McKean's rates in intervenor's proposal to account for intervenor's employees' locations. As noted above, the Navy determined:

(i). Prime Direct Labor.
McKean proposed direct labor rates for 28 labor categories with a list of rates for 128 employees. McKean's direct labor rates were developed by using the actual salaries for the proposed current McKean employees or the contingent salaries (three employees) for the proposed contingent McKean employees, in which signed Letters of Intent were provided. Although McKean's rates were substantiated with corresponding employee payroll information, clarifications revealed not all of the payroll information provided was for work within San Diego. Twenty of the 128 proposed rates were based on actual labor rates for named individuals whose labor rate were substantiated by payroll records and whose place of performance of work was San Diego, CA, were deemed realistic and reasonable and are shown in averages in the first table below. The rates for 108 of the 128 rates proposed by McKean were based on work performed outside of San Diego. 24 of the 108 non-San Diego based rates were found to be equal or above the average San Diego Rates identified in the San Diego Rates Utilized for Cost Realism Analysis Table on page 24 and no cost realism adjustment was made. However, 84 of the 108 non-San Diego based rates for individuals in the remaining 21 labor categories were lower than the San Diego Rates Utilized for Cost Realism Analysis Table on page 24. The direct labor rates for these 84 employees were realized up accordingly to the San Diego Rates identified in the San Diego Rates Utilized for Cost Realism Analysis Table on page 24, as shown in the second table below. The tables below includes direct labor rates proposed per labor category for the base year, which were escalated by [redacted]% year over year for the option years. Proposed overtime hours for exempt and non-exempt employees were reviewed and found to be realistic. Overtime rates for non-exempt employees working as Junior Configuration Management Specialist, Senior Material Specialist, Material Specialist, Technical Typist, Warehouse/Forklift Operator, and Assembler Electronic/Electrical were proposed [redacted]. Overtime rates for the remaining labor categories proposed were for exempt individuals that were proposed [redacted]. Based on the rationale above, McKean's direct labor rates were realized up accordingly.

The Source Selection Authority's February 24, 2022 Business Clearance Memorandum reflected this adjustment and determined:

> In terms of cost, the risk of unrealistic cost was addressed by performing cost realism analysis of all cost information included within the proposals for all prime contractors and the respective subcontractors. The risk of accepting cost based on unbalanced pricing or underestimating the number of hours required to perform was mitigated by verifying that each of the prime contractors and all subcontractors proposed hours that added up to the total level of effort identified within the RFP per labor category and overall. The risk of accepting unrealistically low cost based on acceptance of rates generated from payroll information outside of the San Diego locality was mitigated via a two-part process, which consisted of: 1) identification of all non-San Diego based rates through review of each contractor's proposals or via clarification, and 2) application of an upward adjustment of non-San Diego rates to the average San Diego rate proposed by all offerors for each labor category. Using the risk mitigation tools referenced above, McKean's proposed cost were adjusted during the cost realism analysis. KES' proposed realistic direct and indirect cost that were compared to company payrolls, and indirect rate information provided by DCAA and DCMA, and were not adjusted during the cost realism analysis. McKean's probable cost of $195,045,486.39 was 4.80% or $9,824,558.83 lower than KES' probable cost of $204,870,045.22. Furthermore, the adjustment does not indicate a lack of understanding of the requirements or a concern regarding performance as based upon their performance in the non-costs factors they understand the work and have done similar work before and well

As discussed above, "[c]ontracting officers 'are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process,'" PAI Corp. v. United States, 614 F.3d at 1351 (quoting Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332), and "[a]ccordingly, procurement decisions are subject to a 'highly deferential rational basis review.'" Id. (quoting CHE Consulting, Inc. v. United States, 552 F.3d 1354) (internal quotation marks omitted; alterations added). The Navy's decision not to adjust intervenor's Combined Technical/Risk Rating was not arbitrary, capricious, or an abuse of discretion. KOAM disagrees with how the Navy evaluated McKean's proposal, however, "[a] protester's mere disagreement with an evaluation does not provide an adequate basis to overturn the agency's decision." Femme Comp Inc. v. United States, 83 Fed. Cl. 704, 740 (2008) (citing Banknote Corp. of Am. v. United States, 56 Fed. Cl. 377, 384 (2003), aff'd, 365 F.3d 1345 (Fed. Cir. 2004)); see also Precise Sys., Inc. v. United States, 122 Fed. Cl. 263, 270 (2015). Based on the facts of the bid protest currently under review, the agency did not act arbitrarily or capriciously in awarding the contract to McKean.

## C O N C L U S I O N

The court, therefore, finds that the agency's actions were not arbitrary or capricious. The contracting officer acted within his discretion by deciding that there was not a conflict of interest, apparent or otherwise. Further, the agency's cost realism analysis was rational. Protestor's motion for judgment on the Administrative Record is **DENIED**. Defendant's and intervenor's cross-motions for judgment on the Administrative Record are **GRANTED**. The Clerk of the Court shall enter **JUDGMENT** consistent with this Opinion.

**IT IS SO ORDERED**.

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**